IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARY BROOKE OBERWETTER, | ) | Case No. 09-CV-0588-JDB |
| | ) | |
| Plaintiff, | ) | PLAINTIFF'S MEMORANDUM |
| | ) | OF POINTS AND AUTHORITIES |
| v. | ) | IN OPPOSITION TO MOTION TO |
| | ) | DISMISS |
| | ) | |
| KENNETH HILLIARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

COMES NOW the Plaintiff, Mary Brooke Oberwetter, by and through undersigned

counsel, and submits her Memorandum of Points and Authorities in Opposition to Defendants'

Motion to Dismiss.

Dated: October 9, 2009          Respectfully submitted,

Alan Gura (D.C. Bar No. 453449)
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665


By:  \_\_\_/s/Alan Gura/_____
Alan Gura

Attorney for Plaintiff

TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    PLAINTIFF DID NOT VIOLATE ANY PROHIBITION ON
      DEMONSTRATIVE CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Plaintiff Did Not Issue Any Unauthorized Permits. 8

      B.    Plaintiff Did Not "Demonstrate" Within the Meaning of the Rule. . . . . . . 9

      C.    Even if Plaintiff Were "Demonstrating," She Did Not Require a
            Permit to Do So. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.   PLAINTIFF DID NOT "INTERFERE WITH AN
      AGENCY FUNCTION." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    Oberwetter's Interaction with Hilliard Did Not
            Constitute Interference.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    Oberwetter Did Not Disobey A Lawful Order. . . . . . . . . . . . . . . . . . . . 16

III.  DEFENDANT HILLIARD'S ARREST OF PLAINTIFF AS
      PUNISHMENT FOR ASKING HIM QUESTIONS VIOLATED
      PLAINTIFF'S FIRST AND FOURTH AMENDMENT RIGHTS. . . . . . . . . . . 17

IV.   DEFENDANTS' DISRUPTION OF QUIET EXPRESSIVE DANCING
      VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHTS. . . . . . . . . . . . . . 20

      A.    The Jefferson Memorial Is A Traditional Public Forum. . . . . . . . . . . . . 20

B.      Application of Defendants' Regulations To Proscribe Silent
        Dancing Is Unconstitutional Regardless of the Forum Analysis. . . . . . . . 26

        1.      *The Silent Dancing Prohibition Fails
                the Public Forum Test*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        2.      *The Silent Dancing Prohibition Fails
                the Nonpublic Forum Test*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V.      THE COMPLAINT STATES A CLAIM FOR EXCESSIVE
         FORCE IN VIOLATION OF THE FOURTH AMENDMENT. . . . . . . . . . . . . 31

VI.     DEFENDANT HILLIARD IS NOT ENTITLED TO
        QUALIFIED IMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

TABLE OF AUTHORITIES

Cases

*Am. Utd. for Separation of Church & State* v. *City of Grand Rapids*,
   980 F.2d 1538 (6th Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Barham* v. *Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Begay v. United States*, 128 S. Ct. 1581 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Board of Airport Comm'rs* v. *Jews for Jesus, Inc.*,
   482 U.S. 569 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Brown* v. *Louisiana*, 383 U.S. 131 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

*Bryant* v. *Gates*, 532 F.3d 888 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Carr* v. *District of Columbia*, 561 F. Supp. 2d 7 (D.D.C. 2008). . . . . . . . . . . . . . . . . . . . . . 33

*City of Chicago* v. *Morales*, 527 U.S. 41 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*City of Houston* v. *Hill*, 482 U.S. 451 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 29, 33

*Cohen* v. *California*, 403 U.S. 15 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-29

*Connecticut Nat'l Bank* v. *Germain*,
   503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*District of Columbia* v. *Little*, 339 U.S. 1 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17

*Dole* v. *United Steelworkers of America*, 494 U.S. 26 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Duran* v. *Douglas*, 904 F.2d 1372 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Friends of the Vietnam Veterans Mem.* v. *Kennedy*,
   116 F.3d 495 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hague* v. *Committee for Indus. Org.*,
   307 U.S. 496 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Henderson* v. *Lujan*, 964 F.2d 1179 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*ISKCON of Potomac, Inc.* v. *Kennedy,*
    61 F.3d 949 (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Lamb* v. *City of Decatur,*
    947 F. Supp. 1261 (C.D. Ill. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Lederman* v. *United States,*
    291 F.3d 36 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-23, 27

*Lewis* v. *City of New Orleans*, 415 U.S. 130 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Pearson v. Callahan*, 129 S. Ct. 808 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Phelps-Roper* v. *Nixon*, 545 F.3d 685 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Phelps-Roper* v. *Strickland*, 539 F.3d 356 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 29

*Shuttlesworth* v. *City of Birmingham,*
    382 U.S. 87 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Shuttlesworth* v. *City of Birmingham,*
    394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Snyder* v. *Phelps,* ___ F.3d ___ ,
    2009 U.S. App. LEXIS 21173 (4th Cir. Sept. 29, 2009). . . . . . . . . . . . . . . . . . . . . 29

*Spence* v. *Washington*, 418 U.S. 405 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Texas* v. *Johnson*, 491 U.S. 397 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States* v. *Bass*, 82 F.3d 811 (8th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

*United States* v. *Boesewetter,*
    463 F. Supp. 370 (D.D.C. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Goldin*, 311 F.3d 191 (3d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*United States* v. *Kokinda*, 497 U.S. 720 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States* v. *Sheehan*, 512 F.3d 621 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 9, 13

iv

*United States* v. *Wilfong*, 274 F.3d 1297 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Wasserman* v. *Rodacker*, 557 F.3d 635 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Statutes and Regulations

36 C.F.R. § 261.3(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

36 C.F.R. § 7.96(g)(1)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 24

36 C.F.R. § 7.96(g)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

36 C.F.R. § 7.96(g)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

36 C.F.R. § 7.96(g)(3)(ii)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 26, 30

36 C.F.R. § 7.96(g)(5)(vii)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

36 CFR § 2.32(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14-17

Other Authorities

E. Karaesmen, Structural Behavior of Historic Masonry Domes
    of Major Importance: An Overview (WIT Press 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 23

Gregory S. Aldrete, Daily Life in the Roman City:
    Rome, Pompeii and Ostia (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Merriam Webster Dictionary, available at
    http://www.merriam-webster.com/dictionary/reverence. . . . . . . . . . . . . . . . . . . . . . . . 28

Thomas Jefferson to N. Burwell, The Writings of Thomas Jefferson
    (Ford, Paul Leicester, ed., 1892-99). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Thomas Jefferson, "Letter to Danbury Baptists," Jan. 1, 1802,
    available at: http://www.loc.gov/loc/lcib/9806/danpre.html. . . . . . . . . . . . . . . . . . . . . 25

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

PRELIMINARY STATEMENT

When the government claims to have erected something "akin to a temple or a shrine," Def. Br. 3, at which the people's "reverence," Def. Br, *passim*, for a political figure is violently enforced by the police, the First and Fourth Amendment violations are palpable. We simply do not live in the sort of country where the police may arbitrarily arrest individuals for displaying insufficient "reverence" – a word the government employs no fewer than a dozen times – for a statue of a long-dead political figure in a public park, or for Officer Hilliard.

If the First Amendment protects anything, it protects irreverence – a term easy to define in concept, but impossible to reduce to an objective code of conduct. Americans are free to creatively celebrate (or condemn) the still-controversial third President and his memorial. The First Amendment also protects – indisputably – the right to talk back to police officers: to criticize them and to ask them questions about their conduct.

Yet on President Jefferson's 265th birthday, that was the "crime" for which Plaintiff was arrested. It now appears plain from Defendants' admissions and exhibits that Ms. Oberwetter did not actually violate either of the regulations for which she was cited by Hilliard, over a period of days, as he searched for a reason to justify his conduct. The fact that no law was broken suffices to sustain a Bivens claim judgment for violation of Plaintiff's Fourth Amendment rights, as does the fact that Plaintiff was arrested for engaging in constitutionally protected expressive activity. Regardless of the seizure's legality, the force used by Defendant Hilliard was excessive, another valid Fourth Amendment claim Plaintiff is entitled to bring before a jury.

1

Hilliard's First Amendment violations are no less acceptable: he dispersed a constitutionally-protected assembly, and arrested an innocent person for deigning to question his authority. Critically, Defendants concede that the parties' interaction with each other, not the expressive dancing which preceded it, most proximately caused the arrest. Yet they do not even mention the relevant body of First Amendment law dealing with this sort of incident.

Last, but not least, the Court's declaratory and injunctive power is required to divorce the government's vague, quasi-religious notions of "temples," "shrines," and "reverence" from its task of operating a public park. Americans must be able to visit their national parks secure in the knowledge that they are free from the sanctions of an arbitrary "reverence police."

The Complaint plainly states legal claims upon which relief can and must be granted.

STATEMENT OF FACTS

As Defendants acknowledge before putting forth a slew of their own facts – some of which are debatable – a motion to dismiss tests the sufficiency of a plaintiff's legal claims. The plaintiff's facts, and all reasonable inferences to be drawn from them, are therefore assumed true. Given Defendants' misinterpretation of the Complaint, and unwarranted submission of evidence including Defendant Hilliard's testimony and reports, Plaintiff is constrained to submit her own declaration as well. However, the Complaint's allegations plainly suffice to state valid claims.

The Jefferson Memorial is usually open to the public 24 hours a day, and was, in fact, generally open to the public at all times relevant to the events described in the Complaint. Complaint, ¶ 9. The Jefferson Memorial is regularly and heavily visited by tourists, including children. Visitors to the Jefferson Memorial talk loudly, make noise, take and pose for photographs, and otherwise behave as though the Memorial is located in a public park – which,

2

of course, it is. Defendants do not enforce at the Jefferson Memorial an atmosphere of quiet reverence of the sort which prevails at the various museums located nearby on the National Mall. Complaint, ¶ 10; Oberwetter Decl., ¶ 3.

The Jefferson Memorial has traditionally been open to the public, and its intended use is consistent with public expression, including, specifically, the expressive activity and assembly of the type engaged in by Plaintiff and her associates on the night of April 12-13, 2008. Complaint, ¶ 11; Oberwetter Decl., ¶ 4. On or about 11:45 p.m. on the night of April 12, 2008, Plaintiff Mary Brooke Oberwetter and several of her friends and acquaintances gathered at the Jefferson Memorial.  The purpose of this gathering was to celebrate and honor Thomas Jefferson, his ideals,  and his political legacy, on the occasion of his birth. Complaint, ¶ 12.

Plaintiff and her associates celebrated and honored Thomas Jefferson by ushering in his birthday, at the Jefferson Memorial, with dance. Plaintiff and her associates commenced dancing at approximately five minutes to midnight, April 13, 2008.  In the individualist spirit for which Jefferson is known, the dancers danced for the most part by themselves, in place, each listening to his or her music on headphones. Complaint, ¶ 13. Plaintiff and her friends did not sing, as alleged by Defendant Hilliard, an activity that would have been inconsistent with their purpose of having a quiet celebration, and their compliance with the posted "QUIET RESPECT PLEASE" sign. Oberwetter Decl., ¶¶ 2, 4.

Plaintiff and her dancing associates numbered approximately 18.  At no time did the number of people dancing reach or exceed 25. Complaint, ¶ 14; *accord* Hilliard Decl., Attachment A (describing "a group of about 20 people"). Apart from Plaintiff and her associates, and employees of the National Park Service, there were very few visitors to the Jefferson

3

Memorial at the time of the dancing. The expressive conduct of Plaintiff and her associates at the Jefferson Memorial did not have the effect, intent or propensity to draw a crowd or onlookers not already present. Complaint, ¶ 15.

Shortly after the dancing commenced, Defendant Hilliard and several other Park Police officers violently dispersed the dancers, shoving and pushing them out of the Jefferson Memorial. Complaint, ¶ 16; Oberwetter Decl., ¶ 9. Defendant Hilliard approached Plaintiff while she was silently dancing in place, listening to music through earbuds.  Defendant Hilliard pushed Plaintiff, and then left.  Moments later, Defendant Hilliard returned to Plaintiff, who was still quietly dancing, and ordered her to leave. Complaint, ¶ 17; Oberwetter Decl., ¶ 9.

Plaintiff removed an earbud so that she could speak with Defendant Hilliard.  Plaintiff asked Defendant Hilliard why he was ordering her to leave, and what law she was violating, but Defendant Hilliard refused to answer, insisting only that Plaintiff stop dancing and leave the Jefferson Memorial. Complaint, ¶ 18. Contrary to Defendant Hilliard's declaration, Hilliard never explained that his intention was to move Plaintiff and her associates to a location where they could have lawfully continued in their expressive behavior. Oberwetter Decl., ¶ 5. Indeed, some of Plaintiff's friends were interrupted in their expressive dancing outside the chamber. Oberwetter Decl., ¶ 1.

With agitation, Defendant Hilliard told Plaintiff that she and her friends were being disrespectful and needed to leave, but at no point did he acknowledge that Plaintiff's presence at the Memorial was out of respect and reverence for Thomas Jefferson. In addition, at no point did Hilliard provide justification for his order other than to repeat that Plaintiff and her friends were being "disrespectful." Oberwetter Decl., ¶ 5.

4

Plaintiff agreed to stop dancing and leave the Jefferson Memorial if Defendant Hilliard would only provide a lawful reason why she needed to do so, but Defendant Hilliard refused to offer any reason whatsoever for his demands, and instead arrested Plaintiff. Complaint, ¶ 19. Indeed, for nearly one minute and forty seconds prior to being arrested, Plaintiff was no longer dancing. Some of that time was spent "just standing there bopping" to the music on her headphones, as Officer Hilliard later described to his colleagues at the Central District Station at Haines Point.  However, by far, the bulk of that time was spent by Plaintiff neither dancing nor bopping, but speaking to Officer Hilliard about what it was she was doing wrong at that point that necessitated her leaving the chamber. Oberwetter Decl., ¶ 6.

Although Plaintiff would later be charged with a criminal violation for expressive dancing, the arrest was immediately precipitated by the fact that Plaintiff was asking Defendant Hilliard questions. At no point did Plaintiff either refuse to stop dancing or refuse to exit the chamber; she simply wanted to know why those orders were being given before following them. Plaintiff asked Officer Hilliard repeatedly what she was doing wrong and told him that she would happily stop doing anything illegal if told what it was. Oberwetter Decl., ¶ 7.

Plaintiff had long since stopped dancing when she was placed under arrest – the legal justification for ordering her to leave the chamber after she had already stopped dancing was never made clear to her, other than that she was being disrespectful, despite the fact that the group had cleared out and she hadn't been dancing for well over a minute. Oberwetter Decl., ¶ 7.

Plaintiff was at all times peaceful and did not resist Defendant Hilliard or any other officer in any way. Complaint, ¶ 20. Defendant Hilliard used more force than was necessary to

effect his arrest of Plaintiff, ripping apart her earbud, shoving her against a pillar, and violently twisting her arm. Complaint, ¶ 19; Oberwetter Decl., ¶ 8.

Plaintiff was issued a citation for "Interfering with an Agency Function," in violation of 36 CFR § 2.32(a)(1)(2), but it was not until three days later that she would also be charged with "Demonstrating Without A Permit" in violation of "36 CFR § 7.963(ii)(C)." Complaint, ¶¶ 22, 24; Hilliard Decl., Attachment D. On May 21, 2008, Plaintiff and Defendant Hilliard appeared before the Court. The Court found that the prosecution of Plaintiff was not properly before the Court and advised Defendant Hilliard that if he wished to proceed, he would have to properly prepare the matter for hearing. Plaintiff has not received any further notice to answer charges arising out of the incident in question. Complaint, ¶ 25.

Plaintiff would again silently dance at the Jefferson Memorial to commemorate Thomas Jefferson's birthday, by herself, and with other like-minded people, but refrains from doing so because she reasonably fears arrest, prosecution, fine, and/or incarceration if she were to do so again. Complaint, ¶ 26. Plaintiff's fear of future physical abuse and arrest interferes with her quiet enjoyment of the National Park system in general and the Jefferson Memorial in particular. Complaint, ¶ 27.

SUMMARY OF ARGUMENT

Defendant Hilliard enforced nothing on the night in question other than his arbitrary will. It certainly does not appear that he was enforcing any regulations of the National Park Service. Defendants point to no law specifically prohibiting the kind of expressive dancing in which Oberwetter was engaged. Examination of the regulations in question show that Oberwetter was not "demonstrating" within the meaning of the law, and even if she were, her group was too

6

small to require a permit. Nor did Oberwetter interfere in any way with an agency function as defined by the regulation. It is a part of Officer Hilliard's "function" to answer, or at least tolerate, legitimate questions posed to him about his conduct.

Since Defendant Hilliard could not have had probable cause to believe Oberwetter broke the laws for which he cited her, regardless of the First Amendment issues, the arrest violated Oberwetter's Fourth Amendment right to be free of unreasonable seizures. As Hilliard used excessive force to effect the arrest, the arrest was unconstitutionally unreasonable even if supported by probable cause.

Defendants expend a great deal of time and effort addressing the First Amendment issues relative to Plaintiff's expressive dancing. But oddly, notwithstanding their acknowledgment that it was Plaintiff's interaction with Defendant Hilliard that most immediately caused the arrest, and considering their argument that this interaction "interfered" with Defendant Hilliard, the motion does not discuss the other First Amendment issue here – Plaintiff's right of free speech directed at a police officer who is confronting her. That right was very well established by the time of the incident, and it was most flagrantly violated, as described in the Complaint. *E.g.*, at ¶ 19.

Unfortunately, Defendants seek to rationalize Hilliard's decision to disrupt the expressive dancing – a core First Amendment activity – by arguing that their regulations reached such conduct, and reached it properly as the Jefferson Memorial is a nonpublic forum at which such activity can be suppressed. This is simply incorrect. The Jefferson Memorial may be a very beautiful park statue, but in the end, a park statue is all it is – a classic example of a traditional public forum, at which no visitor can expect to be completely shielded from the expressions of a

7

free people. Plaintiff does not challenge the demonstration regulation on its face, only its application to quiet, harmless expression and the arbitrary way in which it was applied.

In any event, it does not matter whether the Jefferson Memorial is a traditional public forum or, as the government asserts, a nonpublic forum. The fact remains that the policy at issue is not content-neutral. It is also hopelessly vague. After all, were "reverence" a legal standard, a reasonable jury would find on the facts of this case that the only conduct disrespectful to Thomas Jefferson's memory was not Plaintiff's silent, peaceful dancing in place, but the arbitrary actions of the violent police officer who disrupted her.

ARGUMENT

I.   PLAINTIFF DID NOT VIOLATE ANY PROHIBITION ON DEMONSTRATIVE CONDUCT.

The government's brief leaves the impression that Plaintiff's expressive dancing is proscribed by the Code of Federal Regulations. That is not correct. The plain language of the regulation, not Defendants' description of it, is controlling. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Connecticut Nat'l Bank* v. *Germain*, 503 U.S. 249, 253-54 (1992) (citations omitted).

A.   Plaintiff Did Not Issue Any Unauthorized Permits.

Defendants' alleged support for their proposition exists in 36 C.F.R. § 7.96(g)(3)(ii)(C), the provision Plaintiff is alleged to have violated by engaging in expressive dancing. But Plaintiff could not have violated this subsection. The section merely states that a permit under section 7.96(g)(3) will not be issued for a demonstration or special event at the Jefferson Memorial,

"except for the official annual commemorative Jefferson birthday ceremony."[1] The only person capable of violating this provision is the Regional Director of the National Park Service, were he or she to issue a permit in violation of this provision. 36 C.F.R. § 7.96(g)(3). But even under those circumstances, a person demonstrating under authority of an improperly-issued permit could not be arrested for demonstrating without a permit, because Section 7.96(g) has a *mens rea* requirement. *United States* v. *Sheehan*, 512 F.3d 621, 630 (D.C. Cir. 2008).

Oberwetter could only have been arrested for "demonstrating without a permit" in violation of 36 C.F.R. § 7.96(g)(2) if (1) she was "demonstrating" (2) in a place or manner requiring a permit (3) without the benefit of a valid permit. The first two conditions do not exist on the facts as alleged in the Complaint and, in some measure, conceded by Defendant Hilliard.

B.    Plaintiff Did Not "Demonstrate" Within the Meaning of the Rule.

Defendants' assertions about Plaintiff's conduct coming within some statutory prohibition is supported by the following analysis: "compare Compl. ¶¶12-14 with 36 C.F.R. § 7.96(g)(1)(i))."  Def. Br. 33. Plaintiff agrees that such comparison, missing from Defendants' pleading, is required.

"Demonstrating" is defined by 36 C.F.R. § 7.96(g)(1)(i), which provides in relevant part:

The term ''demonstrations'' includes demonstrations, picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers. This term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers.

---

[1]This exception, nowhere mentioned in the government's brief, is significant. *See infra*.

Oberwetter's conduct, as set forth in the complaint, does not fit this description. First, she did not engage in any of the specific conduct proscribed by the regulation, i.e., "demonstrations, picketing, speechmaking, marching, holding vigils or religious services." Oberwetter and her associates merely listened to music on their headphones while silently dancing, in place, mostly by themselves. Complaint, ¶ 13.

Nor was Oberwetter's conduct "like" demonstrating, picketing, speechmaking, marching, holding vigils or religious services. "The traditional canon of construction, noscitur a sociis, dictates that 'words grouped in a list should be given related meaning.'" *Dole* v. *United Steelworkers of America*, 494 U.S. 26, 36 (1990) (citations omitted). Accordingly, the Supreme Court recently held that a felony DUI conviction was too dissimilar from listed crimes to constitute a violent felony within the meaning of the Armed Career Criminal Act. "[T]o give effect . . . to every clause and word of this [regulation], we should read the examples as limiting the crimes that [the clause] covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Begay v. United States*, 128 S. Ct. 1581, 1585 (2008) (internal quotations and citations omitted).

All of Section 7.96's listed activities typically involve loud vocalization, acting together as a tight-knit body of people and conveying a uniform message. In contrast, the activity at issue was meant to celebrate "the individualist spirit for which Jefferson is known," Complaint, ¶ 13, consistent with the various Jeffersonian quotes adorning the Memorial. Plaintiff's conduct was too dissimilar to the "demonstration" definition's stated examples to qualify.

That Oberwetter's conduct is too dissimilar to the listed examples of "demonstrating" is obvious when considering how her conduct failed to satisfy the next requisite element of

10

"demonstrating:" "conduct . . . which has the effect, intent or propensity to draw a crowd or onlookers." Oberwetter and her associates were quiet, wore headphones, mostly moved about in place, wore no special costumes, employed no signs, lights, or amplification, and did absolutely nothing especially calculated to attract a crowd or onlookers. They visited the Memorial at midnight on a Saturday. The only individual who attracted others to the Memorial during the incident was Officer Hilliard, who called for additional police to disrupt a quiet group of law-abiding Americans in a public park.

Officer Hilliard may well dispute Oberwetter's description of her conduct, but this is a motion to dismiss, not a trial. The Complaint alleges conduct that plainly falls outside the definition of holding a "demonstration."

Finally on this point, Oberwetter's conduct falls squarely within the exemption for "casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers." Silent dancing in place by oneself does not *per se* have the intent or propensity to draw a crowd of onlookers. Of course others gathered at the Jefferson Memorial might glance at a person silently dancing in place, just as they might notice any sort of anomalous individuals – a person muttering to himself, a couple kissing, an Amish family gathering in their normal dress to take in the sights. People may be inherently interesting to each other for a variety of reasons, and indeed, "people watching" is a perfectly good reason to visit a public park.

But listening to headphone music while silently moving  in place is perfectly consistent with "casual park use," even if such silent dancing may be interesting to someone other than a police officer intent on stamping out any "irreverent" conduct at the government's "temple."

11

C.    <u>Even if Plaintiff Were "Demonstrating," She Did Not Require a Permit to Do So</u>.

The Complaint alleges that Plaintiff was among a group of approximately 18 people, whose number never reached or exceeded 25. Complaint, ¶ 14. Defendant Hilliard described  "a group of about 20 people" in his report. Hilliard Decl., Attachment A.

"Demonstrations involving 25 persons or fewer may be held without a permit *provided* that the other conditions required for the issuance of a permit are met . . ." 36 C.F.R. § 7.96(g)(2)(i). A "condition" cannot logically be a location. Where the regulations speak of a location, they consistently employ the term "area." *See, e.g.* 36 C.F.R. § 7.96(g)(3)(ii) ("other park areas"). Permits are also not required in particular "areas" for greater numbers of people. 36 C.F.R. § 7.96(g)(2)(ii). Other regulations specify the conditions governing permits. *See, e.g.* 36 C.F.R. § 7.96(g)(5)(vii)(E) (excluding permit-free demonstrations of 25 or fewer persons from temporary structure allowance).

If the Park Service wanted to adopt a rule banning *all* demonstrations and special events at the Jefferson Memorial, it would simply have done so. Instead, its rules allow for demonstrations of fewer than 26 people at the Jefferson Memorial, and prohibit issuance of a required permit to any greater number of people, with exception of the government's preferred birthday celebration. The government is wrong in claiming that it "could not limit the number of expressive dancers within the Memorial to just one or two people." Def. Br. 25. If the sort of dancing in which Plaintiff was engaged qualifies as a demonstration, the government already limits the number of participants to 25.

This is not only the most straightforward, plain reading of Section 7.96(g), and the one most consistent with the rule of lenity. It is also the view of the D.C. Circuit in describing the

scheme: "Permits are not required for some demonstrations involving fewer than 25 people, nor are they required for demonstrations taking place in certain park areas . . ." *Sheehan*, 512 F.3d at 628 (citing 36 C.F.R. § 7.96(g)(2)(i) and (ii)).

It is not surprising, then, that when it came time to actually charge Oberwetter with something upon her arrest, Defendant Hilliard issued only a citation for "Interfering With An Agency Function." It took Defendant Hilliard *three days* after the incident to cite Oberwetter for "Demonstrating Without A Permit," and even then, he could do no more than cite to a provision governing the Regional Director's behavior, not that of any park visitor.

## II.    PLAINTIFF DID NOT "INTERFERE WITH AN AGENCY FUNCTION."

Just as Defendants improperly assume that Oberwetter's conduct fell within the statutory definition of demonstrating without a permit, so too do they assume that Officer Hilliard's version of events must be accepted by the Court. In considering whether Officer Hilliard had probable cause to believe Oberwetter had "interfered" with him, it is important to reflect at the outset upon what, exactly, Oberwetter is alleging occurred, for it is her allegation – not Officer Hilliard's alternative history – that must be credited at this juncture.

Defendants interpret the Complaint as follows: "It was only after Plaintiff refused to cease her unlawful, expressive activity that Officer Hilliard arrested her." Def. Br. 34. Yet it is unclear what Defendants refer to as the "unlawful expressive activity." If Defendants intend to refer to Oberwetter's expressive dancing as the immediate proximate cause of the arrest, that is not what the Complaint describes, and it is not consistent with Oberwetter's testimony. Complaint, ¶ 19; Oberwetter Decl., ¶¶ 6-7; *cf.* Def. Br. 3-4 n.5.

There is no law forbidding the asking of questions or assertion of constitutional rights. Certainly, 36 C.F.R. § 2.32(a)(1) and (2), the alleged violation of which Oberwetter was initially arrested for, do not forbid such conduct.

A.    Oberwetter's Interaction with Hilliard Did Not Constitute Interference.

"Interference" under 36 C.F.R. § 2.32(a)(1) is defined as "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty."

Nowhere in Defendants' brief is any explanation offered as to which of the activities proscribed in subsection (a)(1) Oberwetter allegedly committed. Of course Oberwetter did none of these things. Even under Defendant Hilliard's version of events, Oberwetter never threatened, intimidated, or resisted him in any remote sense of those words. A claim that Oberwetter "interfered" with the functioning of Hilliard's by asking him questions and asserting her constitutional rights is beyond the meaning of the term.

The definitive precedent on this point is *District of Columbia* v. *Little*, 339 U.S. 1 (1950). Little was convicted under a D.C. municipal ordinance for "interfering with or preventing any inspection" of a public health officer. Little refused to unlock her door for the inspector, and asserted she had a Fourth Amendment right to demand a warrant. The D.C. Circuit reversed, finding that a warrant was indeed required to gain entry into Little's home.

However, the Supreme Court declined to address the constitutional claims, affirming instead on statutory grounds. *Little*, 339 U.S. at 3-4. "For even if the Health Officer had a lawful right to inspect the premises without a warrant, we are persuaded that respondent's statements to

14

the officer were not an 'interference' that made her guilty of a misdemeanor under the controlling District law." *Little*, 339 U.S. at 4.

"Although force or threatened force is not always an indispensable ingredient of the offense of interfering with an officer in the discharge of his duties, mere remonstrances or even criticisms of an officer are not usually held to be the equivalent of unlawful interference . . . The word "interfere" in this regulation cannot fairly be interpreted to encompass respondent's failure to unlock her door and her remonstrances on constitutional grounds." *Little*, 339 U.S. at 6-7. (footnote omitted).

Modern cases exploring the interference provision of Section 2.32(a)(1) are scarce, but instructive. "Interference" as used in the analogous regulation governing Forest Service land, 36 C.F.R. § 261.3(a), was recently interpreted by the Ninth Circuit in *United States* v. *Wilfong*, 274 F.3d 1297 (9th Cir. 2001). That court rejected reliance on *Little* by a logger who continued to log trees on federal lands in direct disobedience of a lawful order to cease the logging, and even encouraged his crew to keep working as he was led away by authorities. "[U]nlike Mrs. Little, Willfong was not asserting a significant constitutional right or merely remonstrating or voicing criticism." *Wilfong*, 274 F.3d at 1302. But this is exactly what Oberwetter alleges occurred at the time of her arrest.

The Eighth Circuit has also expressed some concern about interpreting "interference" to include protected First Amendment activity. In *United States* v. *Bass*, 82 F.3d 811 (8th Cir. 1996), the court affirmed a motorist's conviction for interference because he moved about violently at a traffic stop and refused to obey the officer's instruction to stand still near his car, but added:

> Although the magistrate judge held that Bass refused to answer the Ranger's questions, and held that this was also a violation of section 2.32(a)(1), we are dubious about whether such a refusal would be an interference within the meaning of the regulation, or, if it were, whether the regulation could be constitutionally applied to such a refusal.

*Bass*, 82 F.3d at 812. Refusing to speak as compelled, no less than speaking freely, does not constitute "interference" with a Park Service employee.

    B.    <u>Oberwetter Did Not Disobey A Lawful Order</u>.

"An order given under 36 C.F.R. § 2.32(a)(2) must be 'lawful.' For an order to be lawful under the regulation, it must be 1) given in one of the circumstances outlined in section 2.32(a)(2) and 2) constitutional." *United States* v. *Goldin*, 311 F.3d 191, 194 (3d Cir. 2002).

At the time of her arrest, Oberwetter had ceased dancing and was merely standing inside the Jefferson Memorial, speaking with a police officer. Plainly, she had a constitutional right to *be* at the Memorial. But there is no need to reach the constitutional aspect of whether Defendant Hilliard's order to leave was "lawful" under Section 2.32(a)(2), because the order did not fall into any of the statutory criteria for lawfulness.

"[A] Park Ranger, under the regulation, may only give an order in a limited, rather narrow, set of circumstances." *Goldin*, 311 F.3d at 196. These circumstances are:

> fire fighting operations, search and rescue operations, wildlife management operations involving animals that pose a threat to public safety, law enforcement actions, and emergency operations that involve a threat to public safety or park resources, or other activities where the control of public movement and activities is necessary to maintain order and public safety.

36 C.F.R. § 2.32(a)(2).

Plainly there was no fire, search and rescue operation, wildlife management issues involving threatening animals, or emergency operations going on at the time of the arrest. There

was no "law enforcement action" apart from the order itself, as the remainder of the crowd had dispersed and Plaintiff was not engaged in expressive dancing. That left only the "public movement" provision. But "an order given under the 'public movement' provision may only be given if 'necessary to maintain order and public safety,'" *Goldin*, 311 F.3d at 196 (citing Section 2.32(a)(2)), and regardless of what Defendant Hilliard might say about Plaintiff's activities at trial, the Complaint here alleges no conduct that is disorderly or threatening to public safety on Oberwetter's part.

Section 2.32(a)(2) is narrowly drawn to cover orders connected to a defined set of circumstances precisely so as to avoid sanctioning arbitrary orders based on an officer's whim. Circular, self-validating logic cannot support an order under this sort of regulation. An order to move along, for the sake of moving along, is simply beyond the authorized scope of Section 2.32(a)(2).

III.    DEFENDANT HILLIARD'S ARREST OF PLAINTIFF AS PUNISHMENT FOR
ASKING HIM QUESTIONS VIOLATED PLAINTIFF'S FIRST AND FOURTH
AMENDMENT RIGHTS.

As the federal courts have suggested with varying degrees of clarity in cases such as *Little*, *Wilfong*, *Bass*, and *Goldin*, the interference regulation would be unconstitutional were it interpreted to include questioning or failing to immediately comply with *any* "move along" order. Examining an ordinance making it "unlawful for any person to stand or loiter upon any street or sidewalk . . . after having been requested by any police officer to move on," the Supreme Court remarked:

> Literally read . . . [the challenged] ordinance says that a person may stand on a public
> sidewalk in Birmingham only at the whim of any police officer of that city. The
> constitutional vice of so broad a provision needs no demonstration. It does not provide for

17

government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat. Instinct with its ever-present potential for arbitrarily suppressing First Amendment liberties, that kind of law bears the hallmark of a police state.

*Shuttlesworth* v. *City of Birmingham*, 382 U.S. 87, 90-91 (1965).

The ordinance in *Shuttlesworth* was saved only by a narrowing construction restricting it to traffic control of obstructive behavior. No such limitation saved a Houston ordinance making it "'unlawful for any person to . . . in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty,' and thereby prohibit[ing] verbal interruptions of police officers." *City of Houston* v. *Hill*, 482 U.S. 451, 461 (1987) (footnote and citation omitted).

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill*, 482 U.S. at 461. "The Constitution does not allow such speech to be made a crime. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462-63.

Although Oberwetter was always civil in addressing Hilliard, she was civil by choice, consistent with her own values, and not out of any legal obligation. The Supreme Court has struck down, as barring protected First Amendment speech, an ordinance making it a crime "for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." *Lewis* v. *City of New Orleans*, 415 U.S. 130, 131 (1974). Indeed, the police, by virtue of their position, may be expected to tolerate a greater degree of verbal abuse than ordinary citizens. "[A] properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the

18

average citizen, and thus be less likely to respond belligerently to 'fighting words.'" *Lewis*, 415

U.S. at 135 (Powell, J., concurring) (citation omitted).

Simply put, the offense of "contempt of cop" does not exist under our Constitution.

"[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest

individuals for words or conduct that annoy or offend them." *Hill*, 482 U.S. at 465 (footnote

omitted). To be sure, the police may arrest those who "fail to disperse in response to a *valid*

police order," *Hill*, 482 U.S. at 463 n.11 (emphasis added). But as the drafters of the Park Service

interference regulation recognized, the dispersal order requires some indicia of validity beyond

the officer's whim. For example, there is no duty to obey a sheriff's order to "move along" and

disperse a sit-in protesting the segregation of a library. *Brown* v. *Louisiana*, 383 U.S. 131, 132

(1966). "Indeed, it is apparent that an individual's decision to remain in a public place of his

choice is as much a part of his liberty as the freedom of movement inside frontiers that is a part

of our heritage, or the right to move 'to whatsoever place one's own inclination may direct'

identified in Blackstone's Commentaries." *City of Chicago* v. *Morales*, 527 U.S. 41, 54 (1999)

(Stevens, J.) (citations omitted).

Even if Oberwetter's expressive dancing was constitutionally barred, Oberwetter had long

ceased dancing by the time of her arrest. She was merely asking questions of a police officer and

asserting her rights, actions that are themselves protected by the First Amendment, simply

standing where she had every absolute right to stand – in a public park. This is a dispute for a

jury, properly instructed that Oberwetter's assertions, if credited, show that she was arrested

unconstitutionally for questioning a police officer.

IV.    DEFENDANTS' DISRUPTION OF QUIET EXPRESSIVE DANCING VIOLATED
       PLAINTIFF'S FIRST AMENDMENT RIGHTS.

The government expends great effort painting the Jefferson Memorial as a "nonpublic

forum," but predictably argues that it must prevail even if the Memorial is, as Plaintiff asserts, a

traditional "public forum." Plaintiff takes the opposite view, that her First Amendment rights

were violated regardless of how the Jefferson Memorial might be classified. "[T]he key issue is

the compatibility of the forbidden speech with the purposes to which the site is dedicated."

*Henderson* v. *Lujan*, 964 F.2d 1179, 1186 (D.C. Cir. 1992) (Williams, J., concurring); *cf. United

States* v. *Kokinda*, 497 U.S. 720, 738 (1990) ("[i]t is not necessary . . . to make a precise

determination whether this sidewalk and others like it are public or nonpublic forums) (Kennedy,

J., concurring in judgment).

The forum analysis is merely the means of accomplishing this basic interpretive end, and

as the cases show, it is accomplished in two separate and distinct steps: (1) determination of what

type of forum is at issue, which yields a legal standard to (2) weigh the constitutionality of the

disputed regulation under the particular facts.

A.    The Jefferson Memorial Is A Traditional Public Forum.

The Park Service has "concede[d], as it must, that the Mall is a traditional public forum

for purposes of the First Amendment." *ISKCON of Potomac, Inc.* v. *Kennedy*, 61 F.3d 949, 954

(D.C. Cir. 1995).

> Wherever the title of streets and parks may rest, they have immemorially been held in
> trust for the use of the public and, time out of mind, have been used for purposes of
> assembly, communicating thoughts between citizens, and discussing public questions.
> Such use of the streets and public places has, from ancient times, been a part of the
> privileges, immunities, rights, and liberties of citizens.

*Hague* v. *Committee for Indus. Org.*, 307 U.S. 496, 515 (1939).

Perhaps no park better typifies the traditional public forum than the Mall. "It is here that the constitutional rights of speech and peaceful assembly find their fullest expression." *Friends of the Vietnam Veterans Mem.* v. *Kennedy*, 116 F.3d 495, 496 (D.C. Cir. 1997) (quoting *IKSCON*, 61 F.3d at 952). One would expect that a park statute would serve as a traditional gathering place at which people may freely exchange ideas. For all its elegance and aesthetic beauty, the Jefferson Memorial is a park statue, a sculpture of the President on the National Mall – a public forum.

This does not mean that all expressive conduct appropriate outside the Memorial chamber is appropriate inside of it. The regulations governing the use of traditional public fora in the United States cannot all be identical. "Consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Kokinda*, 497 U.S. at 732 (plurality opinion) (citation omitted); *accord Lederman* v. *United States*, 291 F.3d 36, 43 (D.C. Cir. 2002) ("[a]lthough [legitimate] concerns may provide a basis for reasonable restrictions on the duration or size of a sidewalk demonstration, they cannot justify classifying the area as a nonpublic forum").

But first, it is the "nature and function of the particular forum involved" that must be determined. And "[t]he mere physical characteristics of the property cannot dictate forum analysis." *Kokinda*, 497 U.S. at 727. For example, in *Kokinda*, the forum at issue was a post office. The fact that the physical characteristics were those of a sidewalk did not alter the fact that

the area under consideration was postal property, and so it was the government's interest in running a post office that governed the outcome.

Conversely, the D.C. Circuit rejected the supposedly-unique nature of the East Front Capitol sidewalk as a reason to carve out that sidewalk as a nonpublic forum from the repeatedly-recognized public forum nature of the Capitol Grounds. *Lederman*, supra, 291 F.3d 36. The attempt to carve out the Jefferson Memorial from the character of the National Mall should meet the same fate.

Defendants make at least three errors in labeling the Jefferson Memorial a nonpublic forum. Their first critical error is to confuse forum determination with the reasonableness analysis that must follow it. Directly contradicting *Kokinda*'s instruction that a forum's physical attributes are not to guide the forum determination, everything from the number of steps outside the chamber to the Memorial's place in architectural history indicates to the government that this is a nonpublic forum. But this is all quite irrelevant.

Indeed, the architectural argument may be as obvious as the government claims, but in the opposite manner. For example, Defendants' brief references the Memorial's "ionic columns" eight times, and its dome four times. However, the ionic- columned Temple of Saturn has marked the outer edge of the Roman Forum for almost two thousand years. And it is the "worthy tradition [of] the Roman Forum," *Americans United for Separation of Church & State* v. *City of Grand Rapids*, 980 F.2d 1538, 1543 (6th Cir.1992), upon which the First Amendment jurisprudence protecting free expression in public places rests. The Roman Forum was a focal point of expressive activity:

> Between the various judicial magistrates and public assemblies, there was a need for multiple platforms from which speakers could address crowds, and after the naval victory at Antium in 338 BC, a speaker's platform was erected in the Roman forum . . . These platforms were the stages for many of the dramatic speeches of the Late Republic, such as those in which Cicero denounced Mark Antony.

Gregory S. Aldrete, Daily Life in the Roman City: Rome, Pompeii and Ostia 47-51 (2004). As

for the significance of the dome, historically the "[d]ome was an essential structural component

for all kind of public assembly edifices, from the *Pantheon* to Sinan's Selimiye." E. Karaesmen,

Structural Behavior of Historic Masonry Domes of Major Importance: An Overview 1 (WIT

Press 2003).

Defendants' claim that the Memorial's regulatory history prohibiting expressive conduct

impacts the constitutional analysis is flatly wrong as a matter of law. This was precisely the claim

rejected by the D.C. Circuit in *Lederman* with reference to the Capitol Grounds.

> To begin with, the sidewalk has never been available for public expression primarily because, for almost a century, such expression was prohibited anywhere on the Capitol Grounds by the very statute declared unconstitutional in [1972]. If time, place, or manner restrictions cannot bootstrap themselves into validity by their mere existence, even if prolonged, then unconstitutional restrictions certainly cannot, by their mere existence, bootstrap subsequent restrictions into validity.

*Lederman*, 291 F.3d at 43 (citations and internal quotation marks omitted).

Even were the regulatory history relevant to the constitutional analysis, it would not aid

Defendants. As Defendants concede, the expressive conduct prohibition went into effect in 1976,

Def. Br. 7, thirty-three years after the Jefferson Memorial was completed. Plaintiff was arrested

thirty-two years later. At the time of Plaintiff's arrest, the Jefferson Memorial had existed *without*

the expressive conduct limitation longer than it has *with* the expressive conduct limitation.

Indeed, the fact that the government sought to limit expressive conduct at the Memorial "to

23

substantially enhance the visitor's park experience," Def. Br. 7 (citation omitted), and that a giant

sign reading "QUIET RESPECT PLEASE" is necessary to enforce the regulation, Def. Br. 10,

belie the claim that there is something inherent in the Memorial's architecture indicating the site

is imbued with a type of governmental religiosity separating it from other park statues of

deceased politicians.[2]

Defendants err in claiming a mystical or quasi-religious purpose to the Memorial. The

First Amendment problems inherent in a government-mandated "reverence" for political figures

is discussed in greater detail below, as it is not a legitimate regulatory interest. But as it is

invoked by Defendants in the context of their forum determination,[3] it is worth pointing out that

such mysticism has no place in the forum determination, either.

The government's interest in erecting monuments to historical figures is *not* merely to

promote hero-worship, but history itself. The federal government is most assuredly not in the

business of operating a "shrine" or "temple." Def. Br. 7. The range of religions that Congress is

forbidden from establishing by the First Amendment includes civic religions deifying the

national executive. The Jefferson Memorial commemorates an important figure in American

history, one whose legacy is still celebrated – and debated. It is not a "shrine" or "temple" at

which Americans are restricted to a form of government-sanctioned worship – "reverence" as

interpreted and enforced by Officer Hilliard.

---

[2]The parties clearly dispute the extent to which Defendants actually enforce a sense of calm, tranquility and reverence at the Memorial. Complaint, ¶ 10.

[3]"The Memorial is akin to a temple or a shrine (both in terms of its purpose and its physical characteristics)." Def. Br. 3; *but see* 36 C.F.R. § 7.96(g)(1)(i) (proscribing the "holding vigils or religious services and all other like forms of conduct" at the alleged temple).

Plaintiff and her associates happen to be fans of Thomas Jefferson, but the Memorial is also open to his detractors. A "shrine" or a "temple" may be restricted to believers, but individuals critical of Jefferson's hypocrisy on the issue of slavery, or British monarchists offended by Jefferson's authorship of the Declaration of Independence, are free to visit his statue on the National Mall and express their criticism subject to any appropriate regulation.

Jefferson himself would probably welcome such visitors. There is a certain incongruence of having the government erect a "temple" or "shrine" where expression is to be inherently limited, dedicated to the founder most closely associated with free expression. In this vein, Defendants stress the Jefferson Memorial's alleged quasi-religious attributes with constant reference to the Roman Pantheon upon which it is modeled. Originally built as a temple to the gods of Rome, the Pantheon has been a church since the middle ages. Jefferson might have appreciated the Pantheon in the architectural sense, but there is something deeply ironic about the government's appeal to religion in the context of a memorial to a man famous for declaring "a wall of separation between church and state." Thomas Jefferson, "Letter to Danbury Baptists," Jan. 1, 1802, available at: http://www.loc.gov/loc/lcib/9806/danpre.html Jefferson would have been the last man demanding government-enforced "reverence" to his memory, in the style of that accorded a Roman god. Some of Jefferson's views on church-state relations are inscribed inside the Memorial.

Finally, but by no means of no import, the government's regulations concede that an expressive celebration of Thomas Jefferson's birthday is perfectly consistent with the use of the Jefferson Memorial. A special event permit can be issued "for the official annual

commemorative Jefferson birthday ceremony" at the Jefferson Memorial. 36 C.F.R. §

7.96(g)(3)(ii)(C).

The government's case may depend on arguing that reverence is a sufficiently adequate

standard by which to permit or prohibit conduct, and that Oberwetter and her friends were not

reverent. But the Complaint makes perfectly clear that Oberwetter was celebrating Thomas

Jefferson's birthday, and in light of the fact that the regulation specifically authorizes a birthday

celebration at the Memorial, the government cannot seriously claim that a birthday celebration

(properly conducted) is inconsistent with the Memorial's intended use and inherent nature.

The large statue of the third President is, no less than the park in which it sits, a

traditional public forum. To be sure, it is an area where expression can be regulated consistent

with the location's physical attributes and purpose, but the level of review is one afforded a

public forum.

B.    Application of Defendants' Regulations To Proscribe Silent
      Dancing Is Unconstitutional Regardless of the Forum Analysis.

As Defendants concede, the Jefferson Memorial is certainly a forum of *some* type,

traditional, designated, or otherwise.[4] Accordingly, any law broadly banning virtually all First

Amendment activities there is facially unconstitutional under the First Amendment overbreadth

doctrine regardless of whether the forum involved is a public or nonpublic forum. *Board of*

*Airport Comm'rs* v. *Jews for Jesus, Inc.*, 482 U.S. 569 (1987). Defendants suggest they can ban

_____

[4] Even in a non-public forum, "the State may [only] draw distinctions which relate to the special purpose for which the property is used." *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37, 55 (1983).  At the Jefferson Memorial, where the public is invited to visit and linger, the government cannot arbitrarily restrict behavior of the public.

Oberwetter's expressive conduct because the "shrine" or "temple" is no place for expression a police officer may determine is insufficiently reverential. This is simply not consistent with any sort of First Amendment inquiry.

1.     *The Silent Dancing Prohibition Fails the Public Forum Test*.

Since the Jefferson Memorial is a public forum, "the government's ability to permissibly restrict expressive conduct [there] is very limited: [It] may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Lederman*, 291 F.3d at 44 (citations omitted).

The asserted government interest here, "reverence" for Thomas Jefferson, is neither legitimate (never mind significant) nor content-neutral. To be sure, it is Oberwetter's position that she was, indeed, "reverent" of Thomas Jefferson in silently dancing in place to celebrate his birthday, and to the extent "reverence" for Jefferson is to be the standard, Plaintiff would welcome a jury's verdict sorting out the disputed facts and determining which party was the one who respected Jeffersonian ideals.

But the Court cannot adopt this "reverence" analysis. The government's repeated invocation of its interest in "calm, tranquility and reverence" at the Memorial is misrepresented. If by "calm, tranquility and reverence" the government means a sense of quiet, consistent with a library, *Brown* v. *Louisiana*, supra, 383 U.S. 131 (quiet sit-in at library protected by First Amendment) or court-room, *Cohen* v. *California*, 403 U.S. 15 (1971) (wearing vulgar t-shirt in court protected by First Amendment), then there is no dispute: as the Complaint makes clear,

Plaintiff and her friends were *silent* and tried to remain that way, and they did not do anything to interfere with the very few people present at the Memorial on a Saturday midnight.

But even where this Court's dicta accepted an interest in "calm, tranquility and reverence" at the Jefferson Memorial, it rejected the argument that because "the Kennedy Center is dedicated to the performing arts and has a close association in visitors' minds with the memory of a slain president," the need to preserve "an atmosphere of calm and tranquility" there justifies a ban on religious leafleting. *United States* v. *Boesewetter*, 463 F. Supp. 370, 372 (D.D.C. 1978). President Kennedy is still within the living memory of millions of Americans; Thomas Jefferson is not.

Since Plaintiff was quiet and peaceful, and given Defendant Hilliard's statements to Oberwetter as well as the pervasive religiosity of Defendants' arguments, it is clear that Defendants are advancing another view of "reverence" as their interest: the display of "honor or respect . . .especially . . .profound adoring awed respect." Merriam Webster Dictionary, available at http://www.merriam-webster.com/dictionary/reverence. Under this definition, there is no doubt no doubt that the government's preference and demand for "reverence," unlike its posted demand for "quiet" at the Jefferson Memorial, is decidedly *not* content neutral. After all, many people are deeply critical of Jefferson. Must they be reverent of the man or stay away from his Memorial? A visitor to the Memorial wearing a t-shirt bearing a vulgar anti-Jeffersonian slogan would not be reverential, but under the First Amendment could not be asked to conceal his message. *Cohen*, 403 U.S. at 25.

Precedent makes clear that Defendants' interpretation of "reverence" is not content neutral and cannot be a valid government interest. Perhaps the ultimate lack of respect and

"irreverence" is demonstrated by the activities of a church group that pickets military funerals, targeting the grieving families with messages such as "Thank God for Dead Soldiers," "You're Going To Hell," and "God Hates You" – typically held as protected speech under the First Amendment.[5] *Snyder* v. *Phelps*, ___ F.3d ___ , 2009 U.S. App. LEXIS 21173 (4th Cir. Sept. 29, 2009); *Phelps-Roper* v. *Nixon*, 545 F.3d 685 (8th Cir. 2008); *but see Phelps-Roper* v. *Strickland*, 539 F.3d 356 (6th Cir. 2008) (upholding content neutral ban on funeral picketing). And of course, while Oberwetter's silent dancing in place offended Defendant Hilliard's sense of decorum, such activity pales in "irreverence" to the burning of the American flag, also protected by the First Amendment. *Texas* v. *Johnson*, 491 U.S. 397 (1989).

Indeed, although irreverence may, as noted, at times be disgusting, it is also often a virtue. "[T]he First Amendment recognizes, wisely we think, that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." *Hill*, 482 U.S. at 472. "If absolute assurance of tranquility is required, we may as well forget about free speech. Under such a requirement, the only 'free' speech would consist of platitudes. That kind of speech does not need constitutional protection." *Spence* v. *Washington*, 418 U.S. 405, 416 (1974) (Douglas, J., concurring) (citation omitted).

Of course, "reverence" as defined by Defendants is not merely content-discriminatory. It is also hopelessly vague. "One man's vulgarity is another's lyric." *Cohen*, 403 U.S. at 25. The government "may not empower its licensing officials to roam essentially at will, dispensing or

---

[5]These examples already push the limit of what counsel might put in a pleading. More vulgar, unprintable speech at funerals, aimed at the bereaved, has also been deemed protected.

withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community." *Shuttlesworth* v. *City of Birmingham*, 394 U.S. 147, 153 (1969).

Finally, the ban on this particular kind of expression does not leave sufficient ample alternative means of expression. There is something unique about celebrating Thomas Jefferson's birthday at his Memorial on the Mall. The government recognizes as much, for when such celebration falls within the statutory meaning of "demonstrating," this is exactly the one demonstration for which the government will issue a permit. 36 C.F.R. § 7.96(g)(3)(ii)(C).

2.       *The Silent Dancing Prohibition Fails the Nonpublic Forum Test.*

Regulations restricting speech in a nonpublic forum "need only be reasonable in light of the purpose of the forum and viewpoint-neutral." *Bryant* v. *Gates*, 532 F.3d 888, 897 (D.C. Cir. 2008). Even were the Memorial a nonpublic forum, as described above, Defendants' version of "reverence" is not viewpoint-neutral. What the government deems respectful of Jefferson is allowed; what the government deems disrespectful of Jefferson is excluded.

Neither is the regulation reasonable in light of the forum's purpose. The forum's purpose cannot be merely to venerate Jefferson, but to encourage the national discussion about his legacy – an activity inherently requiring a frank exchange of views. Moreover, if the Memorial's purpose is exclusively to celebrate Jefferson's views, it is inconsistent with that purpose to stifle the sort of free expression for which Jefferson is memorialized in the first instance. It is particularly inconsistent with that purpose to ban all dancing: "Dancing," said Jefferson, "is a healthy and elegant exercise, a specific against social awkwardness." Thomas Jefferson to N. Burwell, 12 The Writings of Thomas Jefferson, 92 (Ford, Paul Leicester, ed., 1892-99).

V.    THE COMPLAINT STATES A CLAIM FOR EXCESSIVE FORCE IN VIOLATION
      OF THE FOURTH AMENDMENT.

The Complaint describes an excessively violent confrontation that, if credited by a jury,

should lead to an award of damages. There are no bright-line rules here, only issues of credibility

and the balance of evidence to be weighed by a fact-finder. Defendant thus seeks to change the

question, claiming that he had the right to "take quick and decisive action" to effectuate the

arrest. Def.  Br. 36. Of course, shooting Plaintiff would have also been "quick and decisive." The

question is not whether an officer may "take quick and decisive action" to effectuate an arrest.

The question is whether the officer's action was excessive.

The facts here are clearly disputed. Defendant Hilliard claims that Oberwetter and her

friends were still dancing at the time of the arrest. Def. Br. 36. This is not a required reading of

the Complaint and it is not Plaintiff's testimony. Oberwetter Decl., ¶¶ 6-7. The self-serving claim

that Hilliard could have been justified in using almost any amount of force because he could not

predict Oberwetter's reaction might justify *any* use of force. Def. Br. 36. Oberwetter is entitled to

have a jury consider the evidence as to the actual situation. The case relied upon by Hilliard to

justify his actions involved rather different facts. *Wasserman* v. *Rodacker*, 557 F.3d 635 (D.C.

Cir. 2009). The most salient difference here is that Wasserman disobeyed a concededly lawful

order to stop for the officer. Here, Oberwetter claims that she had stopped dancing and was

merely exercising her right to speak with the officer. She exhibited no indicia of flight, rather, the

point of contention is that she stood her ground in exercising her First Amendment right to speak

to a police officer.

31

VI.    DEFENDANT HILLIARD IS NOT ENTITLED TO QUALIFIED IMMUNITY.

The rights violated by Defendant Hilliard were clearly established at the time of the incident, such that qualified immunity is simply not available. First, Defendant Hilliard violated Oberwetter's right to be free of unreasonable seizures by arresting her without probable cause. That this right – the literal command of the Fourth Amendment – was well-established at the time Hilliard violated it, requires no annotation. The fact that it took Hilliard three days to conjure the "demonstrating without a license" violation should be sufficient indication that he had no probable cause at the time of the arrest to believe the silent dancing was unlawful.

As for the other charge leveled at Plaintiff, even without regard to the First Amendment issue, the Supreme Court's definition of "interference" as excluding mere remonstration and the assertion of constitutional rights dates to 1950. And the question of whether this sort of expression, without more, is an arrestable offense, should not be an exotic one for a police officer. It is rather elementary knowledge that the police need some valid reason, other than their own arbitrary will, to issue and enforce a "move along" order.

Likewise, Officer Hilliard cannot seriously claim that at the time of Plaintiff's arrest, he could not have known that he should not use excessive force to effectuate an arrest of someone engaging in expressive conduct. "[T]here is enough of a widespread Constitutional and judicial protection of First Amendment demonstrators to put the police on notice that unnecessary force is prohibited." *Lamb* v. *City of Decatur*, 947 F. Supp. 1261, 1264 (C.D. Ill. 1996).

To the extent that Hilliard's arrest of Plaintiff for speaking to him in a way that he did not appreciate violated her First Amendment right of free expression, this right, too, has long been established. Nearly twenty years ago, Judge Kozinski explained it in no uncertain terms, rejecting

32

a claim of qualified immunity by an officer accused of arresting a man in retaliation for an

offensive gesture:

> No less well established [than the right against unreasonable seizures] is the principle that government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows -- or should know -- that much. Whether or not officer Aguilar was aware of the fine points of First Amendment law, to the extent he is found to have detained Duran as punishment for the latter's insults, we hold that he ought to have known that he was exercising his authority in violation of well-established constitutional rights.

*Duran* v. *Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) (citing *Houston* v. *Hill*).

To the extent that Officer Hilliard may not have been acquainted with "the fine points of

First Amendment law" with respect to the expressive dancing he was punishing, that, too, is

irrelevant. *Barham* v. *Ramsey*, 434 F.3d 565, 572-73 (D.C. Cir. 2006) (no qualified immunity for

arresting demonstrators without probable cause). Rejecting qualified immunity in a Fourth

Amendment case implicating First Amendment rights, one court has held:

> The fact that this is a Fourth Amendment case and not a First Amendment case does not diminish the First Amendment protections available to the plaintiffs. What value would the First Amendment carry if its demonstrators could be dispersed or intimidated by police brutality or unnecessary force? Qualified immunity is not widely available in an area so closely touching our most precious freedoms.

*Lamb*, 947 F. Supp. at 1264 (citations omitted).[6] Of course, in this District, the police are well

aware that arresting people lawfully exercising their First Amendment rights carries liability.

*Barham*, supra, 434 F.3d 565; *Carr* v. *District of Columbia*, 561 F. Supp. 2d 7 (D.D.C. 2008). If

it took Defendant Hilliard three days to misinterpret the permit regulations to conjure a

---

[6]It does not matter whether a Bivens claim is available for a pure First Amendment violation. A Bivens claim is plainly available for a *Fourth* Amendment violation, including for arrests that are wrongful because they interfere with First Amendment rights.

"demonstrating without a permit" charge to cover Oberwetter's expressive dancing, perhaps he should have been aware at the time of the arrest that the dancing was constitutionally protected.

Even were the Court disposed at this early juncture of the litigation, without any discovery, to grant the government qualified immunity on any or all of Plaintiffs claims in this case, it is imperative that this Court also establish whether or not Plaintiff's First Amendment rights were violated. The parties and the general public deserve at least some notice of the scope of First Amendment rights, if any, at the Jefferson Memorial in order to avoid in the future the sorts of confrontations that form the factual basis of this case.

Under *Pearson v. Callahan*, 129 S. Ct. 808 (2009), this Court is no longer necessarily bound to first establish whether or not Plaintiff's rights were violated before it passes on whether the rights were clearly established. But as the Supreme Court explained in Pearson

> we continue to recognize that it is often beneficial [to do so]. For one thing, there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the 'clearly established' prong. . . . [Additionally] the two-step procedure promotes the development of constitutional precedent.

*Pearson*, 129 S. Ct. at 818. As Defendants claim they may lack enough knowledge of the people's individual rights, they, too could stand to benefit from a decision declaring whether, on the facts alleged, Oberwetter's rights were violated. It appears clear that they were.

CONCLUSION

The First Amendment protects vulgar expressions at funerals and court houses. It protects flag-burning. It also protects silent dancing in place that interferes with no one, on the National Mall, in front of a statue of a politician revered for defending freedom of expression. The First Amendment does this even if the government believes such conduct is "irreverent," even if the

government would like for people to do nothing but worship the statue in its "shrine" or "temple."

And yet the First Amendment protects even more: it protects the right of individuals to ask questions of police officers, whether the officers like it or not. But while the First Amendment is broad, the Defendants' regulations of speech are specific and narrowly tailored. Specific enough so as not to contemplate Plaintiff's silent dancing or conversation with Hilliard, which further establishes the Fourth Amendment violation in arresting her for such conduct.

The Complaint plainly states claims upon which relief can and must be granted. The motion to dismiss must be denied.

Dated: October 9, 2009    Respectfully submitted,

           Alan Gura (D.C. Bar No. 453449)
           Gura & Possessky, PLLC
           101 N. Columbus Street, Suite 405
           Alexandria, VA 22314
           703.835.9085/Fax 703.997.7665


        By: /s/Alan Gura/
           Alan Gura

           Attorney for Plaintiff