# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MARY BROOKE OBERWETTER,**

　　**Plaintiff,**

　　　　v.

**KENNETH HILLIARD and KENNETH L. SALAZAR,**

　　**Defendants.**

Civil Action No.  09-0588 (JDB)

## MEMORANDUM OPINION

On April 12, 2008 -- the eve of Thomas Jefferson's birthday -- Mary Brooke Oberwetter and seventeen of her friends gathered at the Jefferson Memorial to honor the former president, intending to do so through "expressive dance."  Oberwetter, however, was stymied when shortly after beginning her celebration, Officer Kenneth Hilliard of the United States Park Police ordered her to stop dancing and leave the Jefferson Memorial.  She refused, and asked Officer Hilliard the reason for his command.  He did not answer, and instead arrested Oberwetter for demonstrating without a permit and interfering with an agency function.

Based on these events, Oberwetter brings this action against Officer Hilliard and Kenneth Salazar, in his official capacity as Secretary of the Department of the Interior.  She seeks declaratory and injunctive relief on the theory that her expressive dancing is protected by the First Amendment, and therefore Officer Hilliard's suppression of that activity is unconstitutional. Oberwetter also seeks monetary damages from Officer Hilliard based on alleged violations of her First and Fourth Amendment rights.  Before the Court is [6] defendants' motion to dismiss, on which the Court heard oral argument on December 11, 2009.  Upon consideration of the

applicable law, the parties' several memoranda and the entire record herein, and for the reasons stated below, the Court grants defendants' motion.

## I. Background

### A.

The National Park Service is tasked with regulating the Nation's parks and monuments, which include the parks and monuments of the National Capital Region.  See 16 U.S.C. § 1; ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 951 (D.C. Cir. 1995).  The Park Service's National Capital Region comprises, in part, "the National Mall, the Washington Monument grounds, and the Lincoln, Jefferson, and Vietnam Veterans Memorials."  ISKCON, 61 F.3d at 951.  "The Park Service has been directed to protect the 'fundamental purposes' of the Mall and of the other parks and monuments within the National Capital Region."  Id. at 952.  To fulfill this duty, it has promulgated regulations governing the use of these parks and monuments.  See id.; see also 36 C.F.R. § 7.96 (regulation governing parks and monuments in the National Capital Region).

Of particular relevance here, the regulations generally prohibit demonstrations and special events in the parks and monuments of the National Capital Region, unless they are held "pursuant to a permit issued in accordance with the provisions of [36 C.F.R. § 7.96(g)(2)]."  36 C.F.R. § 7.96(g)(2).  Where a demonstration or special event involves fewer than twenty-six individuals, however, it may occur "without a permit provided that the other conditions required for the issuance of a permit are met."  Id. at § 7.96(g)(2)(i).  These general provisions, however, do not apply to all of the monuments in the National Capital Region.  Indeed, the Park Service may not issue permits for demonstrations and special events at the Washington Monument, the

Lincoln Memorial, the Jefferson Memorial, and the Vietnam Veterans Memorial.  See id. §

7.96(g)(3)(ii)(A)-(D).  The Park Service's stated goal in prohibiting demonstrations at these four

monuments is "protecting legitimate security and park value interests, including the maintenance

of an atmosphere of calm, tranquility, and reverence in the vicinity of [these] memorials."  41

Fed. Reg. 12879, 12880 (Mar. 29, 1976).  Despite this broad prohibition on demonstrations at

these four monuments, the Park Service does permit certain "official" commemorative events at

these locations, including "the official annual commemorative Jefferson birthday ceremony."  36

C.F.R. § 7.96(g)(3)(ii)(C).

The regulations also prohibit individuals from interfering with the Park Service's

protection of the nation's parks and monuments.  An individual may not "threat[en], resist[],

intimidat[e], or intentionally interfer[e] with a government employee or agent engaged in an

official duty, or on account of the performance of an official duty."  Id. § 2.32(a)(1).  Nor may an

individual

> [v]iolat[e] the lawful order of a government employee or agent authorized to
> maintain order and control public access and movement during fire fighting
> operations, search and rescue operations, wildlife management operations
> involving animals that pose a threat to public safety, law enforcement actions, and
> emergency operations that involve a threat to public safety or park resources, or
> other activities where the control of public movement and activities is necessary
> to maintain order and public safety.

Id. § 2.32(a)(2).  With exceptions not relevant here, "[a] person convicted of violating a provision

of the [National Park Service's] regulations . . . shall be punished by a fine as provided by law, or

by imprisonment not exceeding 6 months, or both . . . ."  Id. § 1.3(a).

**B.**

The Jefferson Memorial is located on the south bank of the Tidal Basin in West Potomac

Park in Washington, D.C.[1]  This site was chosen for its aesthetic and architectural significance: "The importance of Jefferson as one of the great figures in the Nation's history demanded a memorial site of prominence in the central plan of the Capital City and in relation to the other great memorials already built."  Defs.' Mem. in Supp. of their Mot. to Dismiss ("Defs.' Mem.") [Docket Entry 6], Declaration of Stephen Lorenzetti, Attachment 2 (National Park Service Brochure Describing the Thomas Jefferson Memorial), 1.  The Memorial is a circular, open-air structure topped by a domed roof.  It is surrounded on all sides by a series of Ionic columns, and its interior is again ringed with a series of Ionic columns.  To enter the Memorial, visitors must climb forty steps, rising from ground level to a portico.  These steps are accessible only by means of a public path that runs along the Tidal Basin, and a public path that runs through West Potomac Park.  After ascending the steps, visitors must travel through the portico to enter the Memorial's interior chamber.  This portico provides the only method of accessing the Memorial's interior chamber.  When entering the chamber, visitors pass a sign requesting "Quiet Respect Please."

### C.

Mary Brooke Oberwetter and seventeen of her friends gathered in the interior of the Jefferson Memorial on the eve of Jefferson's birthday to "celebrate and honor Thomas Jefferson,

---

[1] The Court takes judicial notice of the characteristics of the Jefferson Memorial and the parkland surrounding it.  See Fed. R. Evid. 201(b) (judicial notice appropriate where fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").  Although the Court therefore will consider the parties' submissions that describe the physical characteristics of the Memorial and the surrounding parkland in resolving defendants' motion, it will not consider the parties' other declarations and exhibits included with their briefing.  Neither party indicated that the Court should convert defendants' motion to dismiss into a motion for summary judgment.

his ideals, and his political legacy, on the occasion of his birth." Compl. ¶ 12. They did so with expressive dance -- "the dancers danced for the most part by themselves, in place, each listening to his or her music on headphones" because such activity expressed "the individualist spirit for which Jefferson is known." Compl. ¶ 13.

Oberwetter and her friends began dancing "at approximately five minutes to midnight, April 13, 2008 [sic]." Compl. ¶ 13. Shortly thereafter, Oberwetter alleges Officer Hilliard of the United States Park Police "approached Plaintiff while she was silently dancing in place, listening to music through earbud[] [headphones]. Defendant Hilliard pushed Plaintiff, and then left. Moments later, Defendant Hilliard returned to Plaintiff, who was still quietly dancing, and ordered her to leave." Compl. ¶ 17. She offers that she "removed an earbud so that she could speak with Defendant Hilliard," asking why Officer Hilliard "was ordering her to leave, and what law she was violating." Compl. ¶ 18. According to Oberwetter, however, "Defendant Hilliard refused to answer, insisting only that Plaintiff stop dancing and leave the Jefferson Memorial." Compl. ¶ 18.

Oberwetter "agreed to stop dancing and leave the Jefferson Memorial if Defendant Hilliard would only provide a lawful reason why she needed to do so." Compl. ¶ 19. She alleges that Hilliard would not do so, "and instead arrested Plaintiff." Compl. ¶ 19. Although Oberwetter contends that "at all times [she was] peaceful and did not resist Defendant Hilliard or any other officer in any way," Compl. ¶ 20, she states that Hilliard "used more force than was necessary to effect his arrest of Plaintiff, ripping apart her earbud, shoving her against a pillar, and violently twisting her arm." Compl. ¶ 21.

After Oberwetter's arrest, a Park Police officer advised her that she would be charged

with "disturbing the peace," and issued her a citation for "Interfering with an Agency Function" in violation of 36 C.F.R. § 2.32(a)(1)-(2). Compl. ¶ 22. She "was held for approximately five hours before being released." Compl. ¶ 23. "Several days" later, "Park Police officers arrived at Plaintiff's house and gave her two citations issued by Defendant Hilliard: an apparently superceding citation for 'Interfering with an Agency Function,' . . . and an additional citation for 'Demonstrating Without a Permit,' in violation of 36 C.F.R. § 7.96(g)(3)(ii)(C)." Compl. ¶ 24. At her court appearance, the court found "that the prosecution was not properly before the Court and advised Defendant Hilliard that if he wished to proceed, he would have to properly prepare the matter for hearing." Compl. ¶ 25. The Park Service has taken no further action on this matter. Compl. ¶ 25.

Based on these allegations, Oberwetter seeks a declaratory judgment that "expressive activity and assembly of the kind suppressed by Defendant Hilliard on the evening of April 12-13, 2008, is protected by the First Amendment . . . ; and that 36 C.F.R. §§ 2.32(a)(1)-(2) & 7.96 are unconstitutional as applied to prohibit such activity." Compl. ¶ 36. She also seeks an order enjoining the government from enforcing the challenged regulations so as to prohibit expressive dancing within the Memorial. In support of her request for equitable relief, she states that she "would again silently dance at the Jefferson Memorial . . . but refrains from doing so because she reasonably fears arrest, prosecution, fine, and/or incarceration if she were to do so again." Compl. ¶ 26. Oberwetter also pursues three Bivens claims against Officer Hilliard for (1) limiting Oberwetter's right of free speech and assembly in violation of the First Amendment; (2) arrest without probable cause in violation of the Fourth Amendment; and (3) excessive force in violation of the Fourth Amendment. Compl. ¶¶ 28-34.

## II. Standard

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555-56; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570); accord Atherton v. Dist. of Columbia Office of the Mayor, 567 F.3d 672, 681 (D.C. Cir. 2009). A complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. This amounts to a "two-pronged approach" under which a court first identifies the factual allegations entitled to an assumption of truth and then determines "whether they plausibly give rise to an entitlement to relief." Id. at 1950-51.

The notice pleading rules are not meant to impose a great burden on a plaintiff. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002). When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should

be liberally construed in his or her favor.  See Leatherman v. Tarrant County Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bur. of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979); see also Erickson, 551 U.S. at 94 (citing Twombly, 550 U.S. at 555-56).  The plaintiff must be given every favorable inference that may be drawn from the allegations of fact. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."  Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nor does the court accept "a legal conclusion couched as a factual allegation," or "naked assertions [of unlawful misconduct] devoid of further factual enhancement."  Iqbal, 129 S. Ct. at 1949-50 (internal quotation marks omitted); see also Aktieselskabet AF 21. November 21 v. Fame Jeans Inc., 525 F.3d 8, 17 n.4 (D.C. Cir. 2008) (the court has "never accepted legal conclusions cast in the form of factual allegations").

### III. Challenges to the Regulations

### A.

Before the Court may decide Oberwetter's request for declaratory and injunctive relief against enforcement of the regulations, it must resolve two threshold issues.  First, whether only the Regional Director of the National Park Service -- as opposed to an individual like Oberwetter -- may violate section 7.96's prohibitions on demonstrating without a permit.  Second, whether section 7.96(g)(1)(i)'s definition of "demonstration" encompasses the expressive dancing Oberwetter engaged in.  The Court takes each issue in turn.

### 1.

Oberwetter begins by arguing that she could not have violated section 7.96; rather, in her view, "the only person capable of violating [36 C.F.R. § 7.96] is the Regional Director of the National Park Service, were he or she to issue a permit in violation of . . . 36 C.F.R. § 7.96(g)(3)."  Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") [Docket Entry 8], at 9.  She argues that the regulation "merely states that a permit under section 7.96(g)(3) will not be issued for a demonstration or special event at the Jefferson Memorial, 'except for the official annual commemorative Jefferson birthday celebration.'"  Id. at 8-9 (quoting 36 C.F.R. § 7.96(g)(3)(ii)(C)).  Accordingly, she asserts, the regulation does not purport to limit the conduct of any individual visiting the Jefferson Memorial.  See id.

Oberwetter is correct as a semantic matter: no provision of section 7.96 explicitly regulates an individual's conduct.  But section 7.96 allows groups of more than twenty-five people to demonstrate only pursuant to a properly issued permit.  See 36 C.F.R. § 7.96(g)(2).  And section 7.96 prohibits permits for demonstrations at the Jefferson Memorial.  See 36 C.F.R. § 7.96(g)(3)(ii)(C).  If demonstrations must occur with a permit, and permits may not be issued for demonstrations at the Jefferson Memorial, then it follows that individuals may not demonstrate at the Jefferson Memorial.  By this syllogism section 7.96 regulates individual conduct.  Accepting Oberwetter's interpretation of section 7.96, on the other hand, would produce the anomalous result of wholly prohibiting certain conduct, but providing no means of enforcing that prohibition.  The Court is unwilling to interpret the regulation in such a way when both its plain language and its obvious intent support a more sensible reading.

Oberwetter suggests, however, that even if section 7.96 regulates an individual's conduct, it does not prohibit groups of fewer than twenty-six people from demonstrating without a permit

at the Jefferson Memorial.  This is so, she offers, because although no permits may be issued to allow demonstrations at the Jefferson Memorial, demonstrations involving fewer than twenty-six individuals may be held without a permit "provided that the other conditions required for the issuance of a permit are met."  36 C.F.R. § 7.96(g)(2)(i).  And, in her view, there are no conditions on issuing permits at the Jefferson Memorial for the simple reason that no permits may be issued at all for demonstrations at the Memorial -- groups of fewer than twenty-six individuals therefore may demonstrate without restriction at the Jefferson Memorial.  See Pl.'s Opp'n at 12.  Hence, according to Oberwetter, because she danced in a group of eighteen people, Compl. ¶ 12, she could not have violated section 7.96.

Not so.  Whether a permit may be issued at all is a "condition[] required for the issuance of a permit."  Indeed, if demonstrations involving fewer than twenty-six individuals may occur only when the conditions required for the issuance of a permit are met, and there can never be any such conditions because no permits may be issued for demonstrations at the Jefferson Memorial, then it logically follows there can never be any demonstrations involving fewer than twenty-six individuals at the Memorial.  Although the Park Service could have articulated this position more clearly, opacity does not decide cases.  Section 7.96(g)(2)(i) cannot be read as authorizing without restriction demonstrations involving  fewer than twenty-six people at the Jefferson Memorial in light of the complete prohibition on demonstrations involving more than twenty-five people at the Memorial.

Moreover, this interpretation accords with the agency's conclusion that section 7.96 bans all demonstrations at the Jefferson Memorial, which is evident from the National Park Service's application of the regulation to Oberwetter's conduct.  Even if the Court were convinced that the

regulations did not definitively prohibit all demonstrations at the Memorial, it "must give substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  The Court may adopt Oberwetter's interpretation only "if the plain language of the regulation or 'other indications of the [agency's] intent' require" that interpretation.  Orion Reserves Ltd. P'ship v. Salazar, 553 F.3d 697, 707 (D.C. Cir. 2009) (quoting Fabi Constr. Co. v. Sec'y of Labor, 508 F.3d 1077, 1080-81 (D.C. Cir. 2007)).  Here, the plain language of section 7.96 does not support Oberwetter's interpretation that the regulation allows unrestricted demonstrations involving fewer than twenty-six individuals at the Jefferson Memorial; rather the plain language is consistent with the Department of the Interior's reasonable interpretation of the regulation, to which the Court must give substantial deference.

## 2.

Taking another tack in her threshold challenge, Oberwetter contends that even if the regulations could apply to her conduct, she did not "demonstrate" within the meaning of section 7.96(g)(1)(i).  Under the regulation, the term "demonstration" includes

> demonstrations, picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers.  This term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers.

36 C.F.R. § 7.96(g)(1)(i).  To celebrate Jefferson's birthday, Oberwetter "danced for the most part by [herself], in place, . . . listening to . . . her music on headphones."  Compl. ¶ 13.

This activity is a "form of conduct which involve[s] the communication or expression of views or grievances . . . the conduct of which has the effect, intent or propensity to draw a crowd

or onlookers."  First, Oberwetter herself admits that she wished to express an opinion through her

dancing: she danced "to celebrate and honor Thomas Jefferson, his ideals, and his political

legacy, on the occasion of his birth."  Compl. ¶ 12.  Second, her dancing -- especially when done

as part of a large group -- has the effect or propensity to draw a crowd or onlookers.  The Court

finds it no stretch to conclude that such activity would pique the curiosity of a passer-by.  It

certainly is foreseeable to expect visitors to stop and observe a group of expressive dancers at a

national memorial.[2]

   But Oberwetter argues that the Court cannot stop its analysis here -- the mere fact that

conduct may have the effect or propensity of drawing a crowd is insufficient by itself for that

conduct to fall within section 7.96(g)(1)(i).  Rather, in her view, the challenged conduct must

also be sufficiently similar to the activities listed in section 7.96(g)(1)(i).  See Pl.'s Opp'n at 10

(citing Dole v. United Steelworkers of Am., 494 U.S. 26, 36 (1990) ("The traditional canon of

construction, noscitur a sociis, dictates that words grouped in a list should be given related

meaning." (internal quotation marks omitted))).  Following this logic, she contends that her

expressive dancing is unlike section 7.96(g)(1)(i)'s enumerated activities because although they

"typically involve loud vocalization, acting together as a tight-knit body of people and conveying

a uniform message, " her conduct "was meant to celebrate the individualist spirit for which

Jefferson is known."  Pl.'s Opp'n at 10 (internal quotation marks omitted).  But the enumerated

activities encompass a spectrum, from the boisterousness of picketing or speechmaking to the

quiet solicitude of a vigil.  The common thread is that all of the listed activities "have as their

---

   [2] Section 7.96(g)(1)(i) does not require that the challenged conduct actually result in a
crowd or onlookers.  Rather, it is sufficient that such activity have the tendency to produce that
result.

primary purpose the communication or expression of views or grievances." 40 Fed. Reg. 58651, 58652 (Dec. 18, 1975).  Oberwetter's celebration of Jefferson's individual spirit is one example of such an activity.  The Court need not parse whether Oberwetter's conduct falls closer to picketing or to a vigil; that it is "roughly similar" to such conduct is sufficient to bring it within section 7.96(g)(1)(i)'s definition of "demonstration."  See Begay v. United States, 128 S. Ct. 1581, 1585 (2008) (in construing a statute, unenumerated examples should be "roughly similar" to listed elements).[3]

## B.

Because section 7.96 applies to Oberwetter's conduct -- i.e., it is expressive and communicative -- the Court must decide whether the First Amendment gives Oberwetter a right to engage in such conduct in the interior of the Jefferson Memorial, and if so, whether the regulation is constitutional to the extent that it prohibits such activity.[4]  To determine whether a restriction on expressive activity on public property is constitutional, the Court must first identify the nature of public property at issue.  See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460

---

[3] Even if this Court were not convinced that the regulations definitively encompassed Oberwetter's conduct, the Park Service's conclusion that her expressive dancing falls within the regulatory definition is entitled to substantial deference.  See Thomas Jefferson Univ., 512 U.S. at 512.  Neither the plain language nor the regulation's history supports Oberwetter's interpretation that section 7.96(g)(1)(i)'s definition of demonstration excludes expressive dancing.

[4] Oberwetter's dancing is protected activity under the First Amendment.  See R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech, or even expressive conduct.").  Although not all conduct is protected under the First Amendment, it is where it contains a patently expressive message.  See, e.g., Texas v. Johnson, 491 U.S. 397 (1989) (burning American flag to protest Republican nomination of Ronald Reagan); United States v. O'Brien, 391 U.S. 367 (1968) (burning draft registration card to protest Vietnam war).  Such is the case here, see Compl. ¶ 12, which defendants appear to concede.  See Defs.' Mem. at 16 n.12.

U.S. 37, 44-45 (1983).[5]  The nature of the property dictates the showing the government must

make to establish that its restriction is constitutional.  Id.

## 1.

Determining the nature of the Jefferson Memorial's interior is a particularized inquiry,

and turns on the unique characteristics of the Memorial.  See United States v. Kokinda, 497 U.S.

720, 728-29 (1990) (plurality opinion) ("[T]he location and purpose of a publically owned

sidewalk is critical to determining whether such a sidewalk constitutes a public forum."); United

States v. Grace, 461 U.S. 171, 180 (1983) (considering characteristics of sidewalks adjacent to

the Supreme Court to determine if they are a public forum); Henderson v. Lujan, 964 F.2d 1179,

1182 (D.C. Cir. 1992) (considering characteristics of sidewalks adjacent to the Vietnam Veterans'

Memorial to determine if they are a public forum).  The D.C. Circuit undertook such a

particularized inquiry in Henderson, when it considered whether the sidewalks adjacent to the

Vietnam Veterans' Memorial were a public forum for the purpose of assessing the

constitutionality of a ban on leafleting.  See 964 F.2d at 1182-83.  In concluding that the

sidewalks were a public forum, the court focused on the fact that (1) the sidewalks were

physically indistinguishable from ordinary sidewalks "used for the full gamut of urban walking";

(2) the sidewalks "are used by thousands of pedestrians every year, including not only the

Memorial visitors, but also people going to other places"; and (3) the record did not indicate the

---

[5] There are three types of public property for purposes of First Amendment analysis: traditional public forums, designated public forums, and nonpublic forums.  See Perry, 460 U.S. at 45-46.  A traditional public forum is a site that "by long tradition or by government fiat has been devoted to assembly and debate."  Id. at 45.  A designated public forum is "public property which the State has opened for use by the public as a place for expressive activity."  Id.  A nonpublic forum is "public property which [is] not by tradition or designation a forum for public communication."  Id. at 46.

sidewalks at issue had a specialized use.  Id. at 1182.

Oberwetter's expressive conduct occurred in the interior of the Jefferson Memorial, not on the sidewalks or parkland surrounding it.  And the physical characteristics of the Memorial's interior indicate that it is a nonpublic forum.  It is physically distinguishable from the surrounding parkland: an individual must affirmatively decide to visit the interior of the Jefferson Memorial.  The visitor must step off of a path, ascend forty steps, and traverse a portico -- passing a sign requesting "Quiet Respect" -- before entering the Memorial's interior.  Unlike the sidewalks at issue in Grace and Henderson, the pedestrian is inevitably aware that in moving from the parkland to the interior of the Memorial he or she "ha[s] entered some special type of enclave."  Grace 461 U.S. at 180.  A pedestrian simply does not "happen" upon the interior of the Memorial.

Furthermore, the Jefferson Memorial has the specialized purpose of publicizing one of the nation's founders -- supporters and critics alike may visit the Memorial to contemplate Jefferson's place in history.  This purpose marks the Memorial as unique, and hence unlike quintessential examples of public fora -- streets, parks, and sidewalks, all "necessary conduit[s] in the daily affairs of a locality's citizens, but also . . . place[s] where people may enjoy the open air or the company of friends and neighbors in a relaxed environment."  Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 651 (1981).[6]  Indeed, the National Park Service has

---

[6] Oberwetter offers that the "'Mall is a traditional public forum for purposes of the First Amendment.'"  Pl.'s Opp'n at 20 (quoting ISKON, 61 F.3d at 954)).  That may be so for portions of that large open area.  But the Jefferson Memorial is not a part of the National Mall, and even if it were, such a general reference is insufficient to label the interior of the Memorial a public forum.  See Henderson, 964 F.2d at 1182 ("paths leading to [Vietnam Veterans'] Memorial wall" might be nonpublic fora, even though they are surrounded by areas constituting traditional public fora).

closed the interior of the Jefferson Memorial to a wide range of expressive conduct, thereby

indicating that it is "public property which [is] not by tradition or designation a forum for public

communication."  Perry, 460 U.S. at 46; see also Marlin v. Dist. of Columbia Bd. of Election &

Ethics, 236 F.3d 716, 719 (D.C. Cir. 2001) (interior of polling place a nonpublic forum because

of "longstanding limitations on polling place speech").

　　　　Nevertheless, Oberwetter contends that the Park Service's ban on expressive conduct in

the interior of the Jefferson Memorial actually supports her conclusion that it is a public or

designated public forum.  She notes that although the Memorial was completed in 1943, the Park

Service's prohibition did not go into effect until 1976; therefore, she argues, "the Memorial had

existed without the expressive conduct limitation for longer than it has with the expressive

conduct limitation."  Pl.'s Opp'n at 23.  But even though a ban on expressive conduct may not

have been in place for the Memorial's entire existence, the restrictions are not invalid "merely

because the government has for a time stayed its hand."  Henderson, 964 F.2d at 1183. see also

Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 802 (1985) (government

cannot create a public forum "by inaction or by permitting limited discourse").  The history of the

Memorial prior to the expressive conduct ban would be relevant only if the interior of the

Memorial were a traditional public forum or designated public forum during the period prior to

the agency's promulgation of the prohibition.  There is no allegation that was the case.  Taken

together, then, the characteristics of the Jefferson Memorial and its regulatory history indicate

that the Memorial's interior is a nonpublic forum.

　　　　Even so, Oberwetter contends that, at the least, the interior of the Jefferson Memorial is a

designated public forum for the purposes of celebrating Thomas Jefferson's birthday.  This is so,

she posits, because the National Park Service permits "the official annual commemorative Jefferson birthday ceremony" at the Jefferson Memorial.  36 C.F.R. § 7.96(g)(3)(ii)(C).  And therefore, in her view, "the government cannot seriously claim that a birthday celebration (properly conducted)" -- which, she asserts, her expressive dancing reflected-- "is inconsistent with the Memorial's intended use and inherent nature."  Pl.'s Opp'n at 26.  But Oberwetter cannot convert the government's limited allowance of an official birthday celebration into a general public right to "demonstrate" at the Jefferson Memorial in celebration of the former President's birthday: again, "[t]he government does not create a public forum by inaction or by permitting limited discourse."  Cornelius, 473 U.S. at 802.

## 2.

A prohibition on expressive activities in a nonpublic forum does not violate the First Amendment if it is viewpoint neutral and is "reasonable in light of the use to which the forum is dedicated."  Grace, 461 U.S. at 178; see also Perry, 460 U.S. at 46.  Here, the ban on demonstrations at the Jefferson Memorial satisfies these requirements.

As discussed above, the purpose of the Memorial is to publicize Thomas Jefferson's legacy, so that critics and supporters alike may contemplate his place in history.  The Park Service prohibits all demonstrations in the interior of the Jefferson Memorial, in order to maintain an "an atmosphere of calm, tranquility, and reverence," 41 Fed. Reg. at 12880, and thereby fulfill this purpose.  The D.C. Circuit has recognized these interests as legitimate goals of speech regulation at our national memorials.  See Henderson, 964 F.2d at 1184 ("This interest in maintaining a tranquil mood at the [Vietnam Veterans'] Memorial wall is similar to ones that the Supreme Court and this court have recognized as substantial."); see also Frisby v. Schultz, 487

U.S. 474 (1988) (no picketing in front of a house in order to protect tranquility of home); City Council v. Taxpayers for Vincent, 466 U.S. 789 (1984) (signs on public property can be "visual assault"); White House Vigil for the ERA Committee v. Clark, 746 F.2d 1518 (D.C. Cir. 1984) (interest in preserving public's view of White House justified ban on displaying signs on sidewalk in front of White House).  Prohibiting demonstrations is a reasonable means of ensuring a tranquil and contemplative mood at the Jefferson Memorial.  The Court can imagine that permitting the public to engage in expressive dancing -- and various other forms of demonstration -- could interfere with such an environment.  That such conduct may result in a crowd or onlookers is but one example of how the conduct could undermine "an atmosphere of calm, tranquility, and reverence," a result that need not be tolerated before it is prevented.  See Cornelius, 473 U.S. at 810 ("[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum.").

The Court recognizes that the regulation's definition of "demonstration" may encompass conduct potentially not contemplated by the Park Service -- for example, a history professor giving a lecture in the Memorial.  But whether the regulation produces some silly results does not determine the outcome here.  The mere fact "[t]hat narrower regulations might be as effective or more so . . . does not invalidate the means the [Park Service] has chosen.  Regulation of a non-public forum, unlike that of a public forum, need not be 'narrowly drawn to achieve its end.'" Marlin, 236 F.3d at 721 (quoting Perry 460 U.S. at 45); see also Cornelius, 473 U.S. at 808 ("The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation.").  Accordingly, the Court cannot, and will not, substitute its own vision of the best regulation to achieve the Park Service's interest,

given that section 7.96 is reasonable as drafted.

The regulation is viewpoint neutral because its prohibition of "demonstrations" does not favor certain ideas over others.  See Boos v. Barry, 485 U.S. 312, 319 (1988).  The Park Service has not, in precluding the array of expressive activities that have an "the effect, intent or propensity to draw a crowd or onlookers," 36 C.F.R. § 7.96(g)(1)(i), denied "access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject," Cornelius, 473 U.S. at 806.  Indeed, the regulations do not limit the message of speech at all; rather they exclude all demonstrative activities that reasonably could interfere with the "atmosphere of calm, tranquility, and reverence" at the Memorial.[7]

*     *     *     *     *

Because the Jefferson Memorial is a nonpublic forum, section 7.96 need only be viewpoint neutral and reasonable.  It satisfies both these requirements.  Hence, Oberwetter is not entitled to a declaratory judgment that "expressive activity and assembly of the kind suppressed by Defendant Hilliard on the evening of April 12-13, 2008, is protected by the First Amendment . . . ; and that 36 C.F.R. §§ 2.32(a)(i)(2) & 7.96 are unconstitutional as applied to prohibit such activity."  Compl. ¶ 36.

---

[7] Oberwetter suggests that the government's interest in "reverence" is a viewpoint-based restriction on speech.  See Pl.'s Opp'n at 28-29.  She ignores the fact that the Henderson court found such an interest legitimate.  See Henderson, 964 F.2d at 1184.  Moreover, her argument rests on semantic play.  She asks this Court to define "reverence" as "unyielding adoration."  But in the context of the regulation, the Park Service uses "reverence" only as a synonym for "tranquil" and "contemplative."  The Court cannot accept Oberwetter's unduly narrow definition, especially when it does not comport with the D.C. Circuit's understanding of the term as used in the same context.

## IV. <u>Bivens</u> Claims

Oberwetter also seeks money damages from Officer Hilliard based on her allegations that he (1) violated her First Amendment rights by suppressing her expressive dancing; (2) violated her Fourth Amendment rights when he arrested her without probable cause; and (3) violated her Fourth Amendment rights in using excessive force when arresting her.  For their part, defendants contend that Oberwetter is not entitled to damages because qualified immunity shields Officer Hilliard's actions.

Qualified immunity protects a government official "'from liability for money damages insofar as [the challenged] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 815 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  There are two inquiries involved in the qualified immunity analysis.  First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001), <u>overruled on other grounds by</u> <u>Pearson</u>, 129 S. Ct. at 818.  And second, "whether the right was clearly established."  <u>Id.</u>  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Id.</u> at 202.  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  <u>Id.</u> at 201; <u>accord</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999) ("[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.").  The Court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand."  <u>Pearson</u>, 129 S. Ct. at 818.

## A.

Oberwetter's First Amendment <u>Bivens</u> claim is premised on the belief that she had a constitutional right to engage in expressive dancing in the interior of the Jefferson Memorial. But the Court has concluded that she possessed no such right, and therefore Hilliard could not have violated Oberwetter's First Amendment rights.  Accordingly, her First Amendment <u>Bivens</u> claim necessarily fails.[8]

## B.

Oberwetter's Fourth Amendment false arrest <u>Bivens</u> claim is grounded in her assertion that Officer Hilliard lacked probable cause to arrest her for her expressive dancing.  Based on the facts alleged in the complaint, however, the Court concludes that Officer Hilliard had probable cause to arrest Oberwetter.  "'Probable cause to arrest exists when the facts and circumstances are sufficient to warrant a prudent person to believe that the individual has committed an offense.'" <u>Olaniyi v. Dist. of Columbia</u>, 416 F. Supp. 2d 43, 61 (D.D.C. 2006) (quoting <u>Fernandors v. Dist. of Columbia</u>, 382 F. Supp. 2d 63, 71 (D.D.C. 2005)); <u>see also</u> <u>Mich. v. DeFillippo</u>, 443 U.S. 31, 37 (1979) (same).  Here, Officer Hilliard approached Oberwetter in the interior of the Jefferson Memorial "while she was silently dancing in place [and] listening to music through earbuds," Compl. ¶ 17 -- conduct prohibited by section 7.96.  Upon Officer Hilliard's observation that

---

[8] Even assuming that Oberwetter was able to show a violation of her First Amendment rights, there is as yet no <u>Bivens</u> cause of action for violating the First Amendment.  And the Supreme Court recently suggested that it would not create an implied cause of action for a violation of the First Amendment, <u>see</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1948 (2009) (free exercise clause), a position that accords with the Court's reluctance to create new <u>Bivens</u> actions generally, <u>see</u> <u>Schweiker v. Chilicky</u>, 487 U.S. 412, 421 (1988).  This Court need not address this issue, however.

Oberwetter was "demonstrating" in violation of section 7.96, he had probable cause to arrest her.

See DeFillippo, 443 U.S. at 37 (probable cause exists where regulation is violated in officer's

presence).[9]

Oberwetter nonetheless contends that Officer Hilliard could not have had probable cause

to arrest her for demonstrating without a permit because he did not cite her for that violation until

several days after her arrest.  Compl. ¶ 24; see also Pl.'s Opp'n at 13 ("It took Defendant Hilliard

three days after the incident to cite Oberwetter for 'Demonstrating Without A Permit,' and even

then, he could do no more than cite a provision governing the Regional Director's behavior, not

that of any park visitor.").  Such a temporal lag, however, does not alter the Court's conclusion.

The probable cause inquiry is objective.  See Whren v. United States, 517 U.S. 806, 812-13

(1996).  Therefore, "the fact that the officer does not have the state of mind which is

hypothecated by the reasons which provide the legal justification for the officer's action does not

invalidate the action taken as long as the circumstances, viewed objectively, justify that action."

Scott v. United States, 436 U.S. 128, 136 (1978).  In other words, an officer's subjective motive

does not invalidate objectively reasonable behavior under the Fourth Amendment.  See Whren,

---

[9] Oberwetter suggests that Officer Hilliard could not have had probable cause to arrest her because "the only person capable of violating [section 7.96] is the Regional Director of the National Park Service."  Pl.'s Opp'n at 9.  Although the Court has already disposed of this challenge, see Part III.A.1, supra, even were the Court to accept Oberwetter's interpretation it would nonetheless conclude that Officer Hilliard's actions are immune from suit.  Based on the structure of the regulation, Officer Hilliard could reasonably have concluded that the regulation prohibited Oberwetter from engaging in expressive dancing in the interior of the Jefferson Memorial.  And such a reasonable belief, even if mistaken, entitles Officer Hilliard to qualified immunity.  See Wardlaw v. Pickett, 1 F.3d 1297, 1304 (D.C. Cir. 1993); see also Hunter v. Bryant, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987))).

517 U.S. at 812.  The Court need not consider why Officer Hilliard waited three days to cite Oberwetter for demonstrating without a permit because the objective facts supporting the citation for demonstrating without a permit existed at the time of her arrest.  Because Officer Hilliard had probable cause to arrest Oberwetter then, her false arrest <u>Bivens</u> claim fails even though the Park Police issued the citation three days after her arrest.[10]

### C.

Finally, Oberwetter's Fourth Amendment excessive force <u>Bivens</u> claim is based on her assertion that Officer Hilliard, in effectuating Oberwetter's arrest, "shov[ed] her against a pillar, and violently twist[ed] her arm."  Compl. ¶ 21.  An officer, however, has the authority to use "some degree of physical coercion or threat thereof" during the course of an arrest, and therefore "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.  <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  <u>Id.</u>  An officer will be found to have used excessive force only "if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions."  <u>Rogala v. Dist. of Columbia</u>, 161 F.3d 44, 54 (D.C. Cir. 1998); <u>accord</u> <u>Wardlaw</u>, 1 F.3d at 1303 (judgment for officer appropriate unless "excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions").  This "objective reasonableness" inquiry

---

[10] Although the Court is less confident that Officer Hilliard properly arrested Oberwetter for interfering with an agency function in violation of 36 C.F.R. § 2.32(a)(1)-(2), it need not reach this question because Oberwetter's violation of section 7.96 is sufficient to dispose of her false arrest <u>Bivens</u> claim through the grant of qualified immunity to Officer Hilliard.

"provides the test for evaluating both the scope of the officer's qualified immunity as well as the plaintiff's claim of excessive force under the fourth amendment."  See Wardlaw, 1 F.3d at 1303.

In applying the reasonableness test to Oberwetter's account of her arrest, the Court "considers all of the facts as well as the inferences arising from the facts."  Id.  Here, these facts and inferences indicate that Officer Hilliard's use of force was not excessive.  He arrested Oberwetter after she had twice refused to follow his order to stop dancing and leave the Memorial.  Compl. ¶¶ 17-19; see Wasserman v. Rodacker, 557 F.3d 635, 641 (D.C. Cir. 2009) (use of physical coercion reasonable in part because of "Wasserman's refusal to obey Rodacker's order prior to his arrest[, which] suggested that he might try to resist or escape").  And Oberwetter's arrest occurred in the midst of a group of her friends; although it is now quite clear that no threat existed, at the time Officer Hilliard did not know the full extent of any threat accompanying his arrest of Oberwetter.  See Saucier, 533 U.S. at 208 (significant that officer "did not know the full extent of the threat . . . posed").

In light of these circumstances, it was not unreasonable for Officer Hilliard to effectuate Oberwetter's arrest by shoving her against a wall and manipulating her arm behind her back.  To hold otherwise would be to preclude an officer from using even minimal force to arrest an individual.  See Graham v. Connor, 490 U.S. at 396 (officer may use "some degree of physical coercion or threat thereof" to effectuate an arrest).  Instructively, the D.C. Circuit has upheld as reasonable the level of force Officer Hilliard used here in a factually analogous context.  In Wasserman, a park police officer arrested an individual walking his dogs in violation of a District of Columbia municipal ordinance.  557 F.3d at 636.  The officer arrested the individual by "forcefully pressing upwards on Wasserman's arm before handcuffing him, causing him pain."

Id.  The court found such force "was reasonable . . . to secure [Wasserman's] compliance during

arrest.  Id.  Notably, the court reached this conclusion despite the fact that the individual "was not

moving or offering any resistance" when the officer arrested him.  Id.  Accordingly, the Court can

discern no material difference between the force found reasonable in Wasserman, and that used

by Officer Hilliard here: both officers twisted the arrestee's arm to manipulate it into a position

where the hands could be cuffed.  Compare Compl. ¶ 21, with Wasserman, 557 F.3d at 641.  Nor

can it conclude that the circumstances surrounding the two arrests are sufficiently distinct to

counsel a different outcome here than in Wasserman.

To be sure, Oberwetter also alleges that Officer Hilliard "shov[ed] her against a pillar"

during the arrest, an allegation not made in Wasserman.  But this allegation alone is insufficient

to render Officer Hilliard's conduct unreasonable under the circumstances.  Shoving Oberwetter

against the wall allowed Officer Hilliard to subdue an individual that he reasonably believed

might try to resist arrest or escape.  And it allowed him to quickly arrest her, when he was unsure

of the threat he faced at the time.  Furthermore, Oberwetter nowhere alleges that she suffered

injury as a result of her arrest, either from her arm being twisted or from being shoved against a

pillar.  An absence of "bruise or injury . . . tends to confirm that [Hilliard] did not use 'more force

than reasonably appeared necessary' to secure [Oberwetter's] compliance."  Wasserman, 557 F.3d

at 641 (quoting Scott v. Dist. of Columbia, 101 F.3d 748, 760 (D.C. Cir. 1996)); see also Saucier,

533 U.S. at 209 ("Our conclusion [that the force used was reasonable] is confirmed by the

uncontested fact that the force was not so excessive that respondent suffered hurt or injury.");

Wardlaw, 1 F.3d at 1304 (that an individual "did not consider his injuries severe enough to

-25-

require medical attention" indicates that the force used was reasonable).[11]   Accordingly,

Oberwetter's excessive force <u>Bivens</u> claim fails, along with her First Amendment and false arrest

<u>Bivens</u> claims.

**V.**

For the foregoing reasons, the Court will grant defendants' motion to dismiss.  A separate

Order accompanies this Memorandum Opinion.

        /s/        
JOHN D. BATES
United States District Judge

Dated: <u>January 25, 2010</u>

---

[11] Oberwetter does allege that "[a]s a direct [result] of Defendant Hilliard's violation of Plaintiff's Fourth Amendment rights, Plaintiff suffered a loss of her liberty, <u>physical injury</u>, property damage, and associated mental anguish, shame and humiliation."  Compl. ¶ 30 (emphasis added).   But such a conclusory assertion of physical injury is insufficient to allege that she suffered any injuries as a result of Officer Hilliard's arrest.  <u>See</u> <u>Iqbal</u>, 129 S. Ct. at 1949 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting <u>Twombly</u>, 550 U.S. at 555)); <u>id.</u> ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" (quoting <u>Twombley</u>, 550 U.S. at 557)).  And nowhere, either in her complaint or even in the extensive briefing and argument on defendants' motion, does Oberwetter suggest any specific injury she suffered as a result of Officer Hilliard's conduct.